**In re RESTRAINT OF BOWMAN GAS-KINS FINANCIAL GROUP Accounts Nos. 09L014520 & 09L014538**

**No. A03–147.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 24, 2004.

James P. Gillis, Assistant United States Attorney, Stephen M. Campbell, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for Plaintiffs.

Joseph J. Aronica, Esquire (VA Bar No. 02548), Brian Gallini, Esquire, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this ongoing visa fraud, money laundering, and tax evasion investigation of an individual and the company he controls, the government seeks by preindictment process to restrain funds the targeted company paid to the targeted individual's daughters for the purpose of preserving these funds for future forfeiture. The government claims this money is subject to preindictment restraint, and ultimately to forfeiture, on the grounds (i) that these funds, if not proceeds of visa fraud and money laundering, are subject to preindictment restraint as substitute assets pursuant to 18 U.S.C. § 982(b)(1) (incorporating 21 U.S.C. § 853(p)), or, in the alternative, (ii) that these funds were used to facilitate visa fraud pursuant to 18 U.S.C. § 982(a)(6)(A) and were involved in money laundering pursuant to 18 U.S.C. § 982(a)(1).

After entry and service of a temporary restraining order pursuant to 21 U.S.C. § 853(e)(2) preventing transfer of the

funds, the daughters moved to vacate the order on the grounds (i) that the government has failed to demonstrate probable cause to believe the property would, in the event of a conviction, be subject to forfeiture, as required by 21 U.S.C. § 853(e)(2), (ii) that the funds, at best, are substitute assets and, as such, are not subject to restraint under 21 U.S.C. § 853(e)(2), and (iii) that such restraint would deprive the target of his Sixth Amendment right to counsel by restraining funds intended to be used for his defense. That motion was denied and a new order was issued pursuant to 21 U.S.C. § 853(e)(1)(B) further restraining the funds for ninety (90) days pending an indictment. This memorandum opinion records the reasons for these rulings.

### i.[1]

[**Redacted**] ("A"), a Virginia resident, is the owner and President of [**Redacted**] ("Enterprise"), a Virginia corporation headquartered in Falls Church, Virginia. A and Enterprise are currently targets of an ongoing grand jury investigation into visa fraud (18 U.S.C. § 1546), money laundering (18 U.S.C. § 1956), and tax evasion (26 U.S.C. § 7201),[2] among other crimes, allegedly committed by A and Enterprise. [**Redacted**] ("B") and [**Redacted**] ("C") ("movants") are A's daughters.[3]

Enterprise provides immigration-related services to aliens seeking to obtain permanent residence in the United States including the preparation and submission of applications for employment-based visas and alien registration receipt cards (commonly known as "green cards"). To obtain an employment-based visa, a worker must submit an application for alien labor certification, signed by the alien and the potential U.S. employer, that certifies that there are insufficient U.S. workers qualified to do the work in the job contemplated and that the employer has a specific job the alien can fill.

The record reflects that the government's investigation commenced with an analysis of over 1200 applications for alien labor certification filed by Enterprise with the Virginia Employment Commission ("VEC") and ultimately expanded to encompass a number of other Enterprise immigration filings and numerous interviews with alien beneficiaries and their putative prospective employers. This investigation ultimately disclosed that Enterprise, with A at the helm, submitted to government agencies numerous fraudulent applications for alien labor certifications by certifying falsely (i) that an employer had an existing need for skilled labor that could not be filled by the pool of U.S. workers, (ii) that the employers had tried and failed to recruit U.S. workers for these

---

**1.** The following recitation of facts is derived from (i) two affidavits of Department of Labor Special Agent James D. Powell, one filed in support of the government's motion for entry of a temporary restraining order and the other in support of four search warrants connected with the grand jury investigation, and (ii) a statement of facts signed by Paul V. Mederos and made a part of his plea agreement in connection with his plea of guilty to, among other crimes, conspiracy to commit visa fraud in connection with the Enterprise/A scheme under investigation. *See United States v. Me-*

*deros,* Case No. 1:04cr314 (E.D.Va. July 26, 2004) (Statement of Facts).

**2.** The government contends that Enterprise has not filed corporate income taxes in over five years and that A has not filed a personal tax return since 1995.

**3.** The names of the investigation targets and related persons have been redacted from the published memorandum opinion to maintain the secrecy of the related ongoing grand jury proceedings, but these names are reported in the memorandum opinion filed under seal.

positions, and (iii) that aliens would be hired by these employers if the aliens' employment-based visas were approved. More specifically, the government's investigation shows that A and Enterprise concocted a scheme to charge aliens seeking work permits and green cards significant sums of money, ranging from $5,000 to as much as $80,000, to process their false applications for labor certification and applications for permanent residence. In essence, this scheme involved submitting false applications indicating that various employers, including for example [Redacted] ("Company 1") and [Redacted] ("Company 2"), required skilled laborers and could not fill their open positions from the available U.S. workforce. Yet, in fact, these companies had no need for additional workers, nor did they have any intention of hiring the aliens named on these applications. Further, to certify that no current U.S. workers were willing to fill the "vacant positions," an essential requirement of the labor certification process, Enterprise and A directed employers to place trumped up advertisements for the positions in their local newspapers. When U.S. workers responded to the ads and sought to apply for the jobs, company employees typically turned the applicants away, telling them that the positions had already been filled. In some instances, the workers were interviewed but, at the direction of A and Enterprise, company employees would attempt to disqualify and reject the workers for the advertised positions. In exchange for signing the false applications, the employers received payments from Enterprise and A amounting to sums in the tens of thousands and, in at least one case, hundreds of thousands of dollars.

Some examples illustrate the scheme's scope and nature. For instance, between April 2001 and November 2002, Enterprise filed approximately 400 applications for labor certification with the VEC identifying Company 1, a cleaning company, as the putative sponsoring employer. Each application stated that Company 1 intended to hire aliens as full-time cleaning supervisors when, in fact, Company 1 needed only a fraction of this number of supervisors and did not intend to hire the aliens listed on the applications. Company 1 employees interviewed during the course of the investigation report that they received calls in response to advertisements for jobs that did not exist and that when Company 1 did have job vacancies, it had little difficulty filling them from the U.S. workforce. Significantly, Paul Mederos, a Company 1 employee who entered a guilty plea as a participant in the conspiracy, admitted that he received more than $211,000 in payments from Enterprise between March 2001 and November 2002 for signing approximately 200 of these false labor certification applications.

Enterprise and A engaged in essentially similar conduct with Company 2, a construction company. Between April 2000 and January 2002, Enterprise filed with the VEC more than 250 applications for carpenters, electricians, cement masons, and other building trades, listing Company 2 as the putative employer. At that time, Company 2 had no job vacancies or positions available for the building trades identified on the applications. In fact, during the same interval, Company 2 was steadily reducing its workforce as it headed toward bankruptcy. When a Company 2 employee asked why so many foreign workers were being sponsored, a Company 2 representative explained that the foreign workers would benefit from the sponsorship so they might obtain a job elsewhere once they were admitted to the United States. Nearly every application for labor certification filed by Enterprise naming Company 2 as the employer was signed on behalf

of Company 2 by A's nephew, [**Redacted**] ("D"), who falsely purported to be Company 2's agent. In fact, Company 2 records reflect that D was never employed at Company 2. Also, bogus newspaper advertisements for nonexistent Company 2 positions listed D's New Jersey telephone number.

In addition to these specific illustrative examples, the record also reflects episodes in the visa fraud scheme involving at least four other putative employers not summarized here. And although the record does not clearly establish the absolute amount of money Enterprise received from the visa fraud scheme, it does make clear that the sum was substantial, totaling well over $1 million.[4]

In the course of the grand jury investigation into this alleged scheme, the government learned on October 7, 2004 from documents received pursuant to a grand jury subpoena that movants, B and C, were attempting to liquidate the funds in two Bowman Gaskin Financial Group ("Bowman") accounts, one in each of their names, with current balances of $44,520.74 and $80,298.94, respectively. The government further learned that movants had attempted to transfer the Bowman account funds to the law firm representing A and Enterprise in connection with the ongoing grand jury investigation. Significantly, documents obtained from Bowman and interviews with Bowman personnel reflect that these accounts were opened in

January 2002 with two checks issued by Enterprise, each for $50,000, and that the accounts were thereafter funded almost entirely with money from Enterprise. Also of note, the address listed for both Bowman accounts is Enterprise's address, which is unsurprising given B and C's familial and business connections to Enterprise.[5] A and Enterprise, and presumably movants as well, now seek to use the money in these accounts to finance their defense in connection with the ongoing grand jury investigation.

Upon learning that movants planned to liquidate the funds, the government sought an *ex parte* temporary restraining order pursuant to 21 U.S.C. § 853(e)(2) to prevent the liquidation of these two accounts and thus ensure the availability of the funds for forfeiture in the event A and Enterprise are ultimately convicted of visa fraud or money laundering. At the October 8, 2004 hearing, based on Special Agent James D. Powell's affidavits, the government established the requisite probable cause to believe A and Enterprise had committed visa fraud and money laundering, that the money in the Bowman accounts would be subject to forfeiture upon A's or Enterprise's conviction, and that provision of notice to the affected parties would jeopardize the availability of the property for forfeiture. Accordingly, a Temporary Restraining Order ("TRO") issued pursuant to 21 U.S.C. § 853(e)(2) restraining all funds in account numbers

---

4. The record reflects that in 2001 and 2002, Enterprise's revenues totaled at least $2.3 million. Indeed, during substantially the same time period, between March 2001 and November 2002, Enterprise paid Mederos, a single co-conspirator, $211,000 to sign approximately 200 false applications for labor certification. Given that Enterprise charged aliens between $5,000 and $80,000 per application, it appears that Enterprise received at least $1 million in visa fraud proceeds from these 200 applications alone. Moreover, the

record, taken as a whole, supports a finding of probable cause to believe that a substantial portion, if not all, of Enterprise's revenues were derived from the visa fraud scheme.

5. B is the vice president of Enterprise and C was the founder and president of [Redacted], a predecessor to Enterprise. C, as represented by counsel, now continues in a "consulting" role to Enterprise.

09L014520 and 09L014538 at Bowman Gaskins Financial Group to remain in effect for ten days. *See In re Enterprise,* John Doe No. A03–147 (E.D.Va. Oct. 8, 2004) (Order). On October 12, 2004, Enterprise filed an emergency motion for a hearing, which was granted and a hearing was scheduled for the next day. At the hearing, Enterprise's counsel stated that he also represented B and C, the holders of the accounts, and orally moved to vacate the TRO.[6] By Order dated October 15, 2004, for good cause, the TRO was extended through October 25, 2004. *See In re Enterprise,* John Doe No. A03–147 (E.D.Va. Oct. 15, 2004) (Order). Thereafter, an order issued pursuant to 21 U.S.C. § 853(e)(1)(B) to further restrain the Bowman account funds for ninety (90) days pending an indictment. *See In re Restraint of Bowman Gaskins Financial Group Accounts Nos. 09L014520 & 09L014538,* John Doe No. A03–147 (E.D.Va. Oct. 25, 2004) (Order). Movants now challenge these orders and seek their vacation.

## II.

The government's authority to seek to restrain assets pre-trial to ensure their availability for post-conviction criminal forfeiture proceedings is well-established; Congress has provided for this authority and the Supreme Court has registered its approval. *See* 21 U.S.C. § 853; *United States v. Monsanto,* 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (permitting

pretrial restraint of assets intended to be used for attorney's fees); *In re Billman,* 915 F.2d 916, 921 (4th Cir.1990) (permitting pretrial restraint of third party assets under RICO forfeiture statute). The rationale for this authority is clear; as the Supreme Court observed, "[p]ermitting a defendant to use assets for his private purposes that . . . will become the property of the United States if a conviction occurs cannot be sanctioned." *Monsanto,* 491 U.S. at 613, 109 S.Ct. 2657. Thus, § 853's restraining order provision is intended "to assure the availability of the property pending disposition of the criminal case." *Id.* (quoting 21 U.S.C. § 853's legislative history) (internal quotations omitted). And, as § 853(e) itself makes clear, property may be restrained even prior to the filing of an indictment.[7] What is required for the issuance of a restraining order, both pre-indictment and post-indictment, is a finding that the property will be subject to forfeiture in the event of a conviction. *See* 21 U.S.C. § 853(e).

Before addressing movants' challenges to the orders restraining the funds in issue, it is important to set out the statutory and factual bases for issuance of the TRO.[8]

### A. *Visa Fraud—18 U.S.C. § 1546*

The visa fraud analysis begins with 18 U.S.C. § 1546, which provides that a person is guilty of visa fraud if he knowingly submits a materially false statement in an application required by the immigration

---

**6.** Because it is unclear whether Enterprise would lack standing to bring a motion to vacate an order restraining funds in accounts not held by Enterprise, the motion to vacate is construed as a motion solely on behalf of the account holders, B and C.

**7.** 21 U.S.C. § 853(e)(2) ("A temporary restraining order . . . may be entered . . . without notice or opportunity for a hearing when an information or indictment has not yet been

filed with respect to the property . . . ."); 21 U.S.C. § 853(e)(1) (a court may restrain property pre-indictment for up to ninety (90) days upon a showing that there is "a substantial probability that the United States will prevail on the issue of forfeiture").

**8.** The reasons for the issuance of the order restraining the funds for an additional ninety days is set forth in Section IV.

laws.[9] Penalties for visa fraud include criminal forfeiture. Specifically, 18 U.S.C. § 982 provides that a defendant convicted of a violation of § 1546 must forfeit to the United States (i) any "proceeds" of visa fraud, (ii) any property "derived from or ... traceable to the proceeds" of visa fraud, and (iii) any property "used to facilitate" this crime. *See* 18 U.S.C. § 982(a)(6)(A)(ii).[10] Section 982(b)(1) in turn provides that the forfeiture of property under § 982 and any related judicial proceedings are governed by the provisions of 21 U.S.C. § 853 (with the exception of subsection (d)), which, in subsection (e), sets forth the procedure for pretrial restraint of assets subject to forfeiture. Particularly pertinent here is § 853(e)(2), which authorizes preindictment issuance of a temporary restraining order upon a showing of probable cause to believe (i) that the property would, in the event of a conviction, be subject to forfeiture "under this section," and (ii) that provision of notice would jeopardize the availability of the property for forfeiture.[11]

The next step in the analysis is to determine what property is subject to preindictment restraint "under this section," *i.e.*, § 853. The answer to this question is found first in 18 U.S.C. § 982, which defines the scope of forfeitable assets in visa fraud cases and incorporates § 853 to accomplish the forfeiture,[12] and also in § 853 itself, which further defines the scope of forfeitable property to include substitute property in subsection (p).[13] Thus, § 982(b)(1) defines three categories of as-

9.  28 U.S.C. § 1546 defines the crime of visa fraud in pertinent part as follows:

> Whoever ... under penalty of perjury ... knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations proscribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact ....

10.  Also subject to forfeiture pursuant to 18 U.S.C. § 982(a)(6)(A), but not relevant here, is "any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the person is convicted ...." *See* 18 U.S.C. § 982(a)(6)(A)(i).

11.  Section 853(e)(2) provides as follows:

> A temporary restraining order under this subsection may be entered ... without notice or opportunity for a hearing when an information or indictment has not yet been filed with respect to the property, if ... there is probable cause to believe that the property ... would, in the event of conviction, be subject to forfeiture under this section and that provision of notice will jeopardize the availability of the property for forfeiture.

12.  Congress must have intended for the definitions of property subject to forfeiture provided in 18 U.S.C. § 982 for visa fraud and money laundering violations, to supplant those provided for drug-related violations in 21 U.S.C. § 853(a) and (b).

13.  The relevant paragraphs of 21 U.S.C. § 853(p) provide as follows:

> (1) In general—Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant -
> (A) cannot be located upon the exercise of due diligence;
> (B) has been transferred or sold to, or deposited with, a third party;
> (C) has been placed beyond the jurisdiction of the court;
> (D) has been substantially diminished in value; or
> (E) has been commingled with other property which cannot be divided without difficulty.
> (2) Substitute property—In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.
> 21  U.S.C. § 853(p)(1) and (2).

sets subject to forfeiture in visa fraud convictions:

> (i) any proceeds and property "derived from or ... traceable to the proceeds" of visa fraud;
>
> (ii) any property "used to facilitate the visa fraud;" and
>
> (iii) any substitute property, including otherwise legitimate assets, if assets subject to forfeiture under 18 U.S.C. § 982(a)(6)(A)((i) & (ii) above) are unavailable.

■ In sum, therefore, the funds at issue may be restrained pre-indictment pursuant to § 853(e)(2) if the government establishes probable cause to believe:

> (i) that A and Enterprise committed the crime of visa fraud in violation of 18 U.S.C. § 1546;
>
> (ii) that the funds, before their transfer to B and C's Bowman accounts,[14] were property subject to forfeiture under 21 U.S.C. § 853 as (a) the proceeds of visa fraud, (b) substitute property for the proceeds subject to forfeiture, or (c) funds used to facilitate visa fraud; and
>
> (iii) that provision of notice to movants would jeopardize the availability of the property for forfeiture.

Because movants have conceded the third requirement[15] the remaining question is whether the government has established the first two. The record reflects that it has.

First, the record facts firmly establish probable cause[16] to believe that A and Enterprise committed visa fraud in violation of 18 U.S.C. § 1546 by knowingly submitting materially false statements in applications required by the immigration laws, namely applications for alien labor certification. As recounted in Special Agent Powell's affidavit, former managers and employees of sponsor companies claim that sponsor companies never needed and never hired many of the sponsored foreign workers. Further, these managers and employees reported that job applicants responded to advertisements for jobs that did not exist; indeed, these managers and employees stated they were directed by A or Enterprise employees to disqualify and reject any U.S. workers who interviewed for the nonexistent positions. Lending additional credibility to these claims, Mederos, a Company 1 employee and co-conspirator in the scheme, admitted in the course of his guilty plea that, in exchange for more than $200,000 in payments from

---

**14.** That the government seeks restraint of funds already transferred to a third party and no longer possessed by the target is immaterial to the analysis. Pursuant to 18 U.S.C. § 853(c), all right, title, and interest in property subject to forfeiture vests in the United States upon the commission of the crime. It follows that property transferred to third persons after the crime is committed is also subject to forfeiture, unless the transferee establishes that he is a bona fide purchaser for value without notice that the property was subject to forfeiture. *See* 18 U.S.C. § 853(c). Movants have not argued that they fit this exception, although they may yet do so at the forfeiture stage. *See* 18 U.S.C. § 853(n).

**15.** Movants concede they plan to liquidate the funds in their accounts and to use the funds

to pay the legal fees incurred by A and Enterprise in their defense. Thus, if the targets are convicted, the funds will likely be depleted, if not exhausted, by the time they become subject to forfeiture.

**16.** It is settled that "[p]robable cause for the purpose of forfeiture proceedings is the same standard used in search and seizure cases," and requires a "practical, common-sense decision whether, given all the circumstances set forth ... there is a fair probability" that a crime has been committed or that property is subject to forfeiture. *United States v. Thomas*, 913 F.2d 1111, 1114 (4th Cir.1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (internal quotations omitted).

Enterprise, he signed hundreds of applications for alien labor certification falsely attesting that Company 1 intended to hire aliens for full-time cleaning supervisor positions. Mederos admits that he and his co-conspirators at Enterprise knew that Company 1 had no need for these supervisors and had no intention of hiring any aliens. Statements from others during the course of the investigation reflect that the scheme extended to hundreds of other aliens and multiple additional employers, including Company 2. There, a relative of A, who was never employed by Company 2, signed hundreds of applications for labor certification to attest falsely that Company 2 needed additional skilled laborers unavailable in the U.S. workforce, when in fact Company 2 was in the process of substantially reducing its workforce. In sum, the first requirement for the preindictment restraint of the funds in the Bowman accounts is plainly met, namely that there is probable cause to believe A and Enterprise committed the crime of visa fraud by submitting fraudulent applications for alien labor certification.

Next, preindictment restraint of the Bowman funds also requires the government to establish probable cause to believe that the money transferred from Enterprise to movants' Bowman accounts was money that was (i) derived from or traceable to the visa fraud, (ii) substitute property for such proceeds, or (iii) used to facilitate the visa fraud. The record reflects the government has also met this requirement. There is at least a fair probability, if not certainty, that the funds in the Bowman accounts are the proceeds of Enterprise's visa fraud activities, as directed by A. This conclusion follows from the fact that the Bowman account funds came directly from Enterprise and from the substantial magnitude of the visa fraud scheme. Thus, it appears that the Enterprise–A visa fraud activity spanned approximately a five year period and involved total revenues to Enterprise in excess of seven figures. This persuasively suggests that little, if any, Enterprise revenues were legitimately derived and that the Bowman account funds are proceeds of the visa fraud scheme.

Of course, the current record does not foreclose the possibility that some of Enterprise's revenues may not be tainted by visa fraud, nor does it establish with mathematical precision what percentage, if not 100%, of Enterprise's revenues were the proceeds of the visa fraud enterprise. What the record does convincingly show, however, is that Enterprise received substantial sums of money from the visa fraud, measured in the hundreds of thousands or even millions of dollars,[17] and that Enterprise itself facilitated the commission of the visa fraud. These facts are sufficient to infect the funds transferred from Enterprise to the Bowman accounts; they establish that if not the actual proceeds of the visa fraud, they are, in any event, subject to restraint either as funds commingled with visa fraud proceeds or as funds used to facilitate the criminal visa fraud venture. Thus, pretrial restraint cannot be avoided even if the specific funds in the Bowman accounts cannot be shown with certainty to be direct proceeds of the visa fraud.

■ More specifically, the Bowman account funds, even if not actual visa fraud proceeds, may still be restrained as "substitute assets."[18] By its terms, § 853(e)(2)

---

17. *See supra* note 4.

18. While other circuits have concluded that substitute assets may not be restrained pretrial, it is well-settled in the Fourth Circuit that pretrial restraint of substitute assets is appropriate to preserve those assets for forfeiture if a conviction is ultimately entered. *See Billman,* 915 F.2d at 921 (upholding pretrial

permits preindictment restraint of any assets subject to forfeiture "under *this section*" (emphasis added), namely § 853, which includes subsection (p) substitute property. Subsection (p) provides for forfeiture of substitute assets when actual proceeds are unavailable because, among other reasons described in § 853(p)(A)-(E), the proceeds have been "commingled with other property ... [and] cannot be divided without difficulty." 21 U.S.C. § 853(p)(E).[19] Section 853(p)(2) allows for post-conviction forfeiture of substitute property only up to the value of the forfeitable property made unavailable by commingling or other means described in § 853(p)(A)-(E).[20] It follows that substitute property may be restrained pre-indictment only if there is probable cause to believe that forfeitable property of at least the same value has been made unavailable by some means described in § 853(p)(A)-(E). In this case, because all of Enterprise's revenues, legitimate (if any) or illegitimate, have been indistinguishably commingled in its corporate bank accounts, all Enterprise funds, up to the value of property subject to forfeiture, qualify as commingled substitute property pursuant to 21 U.S.C. § 853(p)(E). And because there is probable cause to believe that Enterprise generated visa fraud proceeds significantly in excess of $125,000, the approximate total amount held in the two Bowman accounts, these funds are subject to restraint in their entirety.

Nor does it matter that the funds were subsequently transferred from Enterprise to third parties, *i.e.*, movants, as § 853(c) makes clear that title vests in the United States upon the commission of the crime and that funds cannot then be immunized from forfeiture by transfer to a third party. *See* 21 U.S.C. § 853(c); *McHan*, 345 F.3d at 271–72 (holding that government's title to substitute property, like subsection (a) property, relates back to date of acts giving rise to forfeiture). The funds were transferred to the Bowman accounts beginning in January 2002, well after Enterprise and A commenced the visa fraud scheme, and thus, also after title in the funds had vested in the United States. It follows that the second requirement for pretrial restraint of the Bowman account funds is also plainly satisfied, as there is ample probable cause to believe that these funds will be subject to forfeiture as substitute assets upon A's or Enterprise's conviction for visa fraud.

Yet, even assuming, *arguendo*, that these assets are not subject to pretrial restraint as substitute property, the funds are nonetheless subject to forfeiture, and thus pretrial restraint, as property "used to facilitate" the visa fraud scheme. *See* 18 U.S.C. § 982(a)(6)(A)(ii)(II). The ability to forfeit the assets of a business entity, legitimate and illegitimate, as property used to "facilitate" crime is well-estab-

restraint of substitute assets under RICO forfeiture provision in 18 U.S.C. § 1963(d)(1)(A)); *United States v. Wu*, 814 F.Supp. 491, 493 (E.D.Va.1993) (applying *Billman* rationale to uphold pretrial restraint of substitute assets under both 18 U.S.C. § 1963(d)(1)(A) and 21 U.S.C. § 853(e)(1)); *United States v. Swank*, 797 F.Supp. 497, 501 (E.D.Va.1992) (holding that 21 U.S.C. § 853(e)(1) authorizes pretrial restraint of substitute assets). *But see* contrary cases cited *infra* note 32.

19. For the relevant paragraphs of 21 U.S.C. § 853(p), *see supra* note 13.

20. *See* 21 U.S.C. § 853(p)(2); *United States v. Faulk*, 2004 U.S. Dist. LEXIS 20935, at *7 (M.D.Ala.2004) ("§ 853(p)(2) allows for the substitution of property only up to the value of the original forfeited property ....").

lished.[21] Facilitation requires only that there be a "substantial connection between the property and the underlying criminal activity." *United States v. Schifferli*, 895 F.2d 987, 989 (4th Cir.1990) (interpreting similar forfeiture provision at 21 U.S.C. § 881(a)(7)); *United States v. Matai*, 173 F.3d 426, 1999 WL 61913 (4th Cir.1999) (unpublished disposition) (applying *Schifferli* definition of "facilitate" to money laundering forfeiture provision in 18 U.S.C. § 982(a)(1)). Importantly, the property's role in the illegal conduct need not be "integral, essential or indispensable;" rather, "the term 'facilitate' implies that the property need only make the prohibited conduct 'less difficult or more or less free from obstruction or hindrance.'" *Schifferli*, 895 F.2d at 990 (quoting *United States v. Premises known as 3639–2nd St., N.E.*, 869 F.2d 1093, 1095–97 (8th Cir. 1989)). It follows, therefore, that Enterprise's employees, buildings, capital, and financial reserves facilitated A's and Enterprise's visa fraud activities by providing the human and financial resources, reputation, and operating capital to carry out the visa fraud. Indeed, Enterprise itself, a company wholly-owned by A, facilitated these crimes simply by providing A a legitimate cover for the illegal conduct; it provided a facade of legitimacy and respectability for the visa fraud activities and made those activities more difficult to detect and expose. *See Matai*, 173 F.3d 426, 1999 WL 61913, at *5 (forfeited clothing store inventory provided facade of respectability and lawfulness to credit card scam). Thus, Enterprise itself, including its property, is subject to forfeiture and hence preindictment restraint as property "used to facilitate" the visa fraud.

In sum, the Bowman account funds are subject to preindictment restraint pursuant to § 853(e)(2) because there is probable cause to believe (i) that A and Enterprise committed the crime of visa fraud, (ii) that the Bowman account funds would be subject to forfeiture under § 853 as substitute assets of visa fraud or as property used to facilitate the visa fraud, and (iii) that the Bowman account funds will not be available for forfeiture upon conviction if not now restrained.

### B. Money Laundering—18 U.S.C. § 1956

The analysis with respect to money laundering begins with 18 U.S.C. § 1956, which defines the crime of money laundering, but is otherwise essentially similar to the visa fraud analysis. As with a visa fraud offense, § 982 provides for criminal

---

21. *See, e.g., United States v. Schifferli*, 895 F.2d 987, 989 (4th Cir.1990) (upholding forfeiture of dentist's office building because it facilitated conspiracy to distribute and dispense illegally prescribed drugs); *United States v. Matai*, 173 F.3d 426, 1999 WL 61913, at *5 (4th Cir.1999) (unpublished disposition) (permitting forfeiture of clothing store inventory because clothing store facilitated credit card scam by providing facade of respectability and lawfulness); *United States v. Baker*, 227 F.3d 955, 969–70 (7th Cir.2000) (upholding forfeiture of entire sex-oriented business, including legitimate operations, when used to launder proceeds of prostitution and other illegal activity); *United States v. Swank Corp.*, 797 F.Supp. 497, 502 (E.D.Va. 1992) ("[T]he ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established").

The forfeiture of property used to "facilitate" a crime is subject to a ceiling established by the Eighth Amendment Excessive Fines Clause. *See United States v. Bajakajian*, 524 U.S. 321, 334, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (holding that punitive forfeiture will violate the Excessive Fines Clause if "grossly disproportional" to the gravity of the offense). Yet, in this case the government has adduced evidence to establish probable cause to believe that Enterprise's fraudulent activity was a substantial portion of its entire business. Moreover, Enterprise has not adduced any evidence to the contrary nor has it or movants raised an Eighth Amendment challenge.

forfeiture penalties upon conviction for money laundering, in violation of § 1956. Specifically, an individual convicted of money laundering under § 1956 must forfeit "any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). Section 982(b)(1) in turn incorporates the provisions of 21 U.S.C. § 853, including § 853(e)(2) and its provision for preindictment restraint of assets subject to forfeiture under § 853.

■ Because movants have conceded that they intend to liquidate the funds if not restrained, then, as in the visa fraud analysis, the government to restrain the funds in the Bowman accounts on money laundering grounds must only establish probable cause to believe (i) that A and Enterprise committed the crime of money laundering in violation of 18 U.S.C. § 1956, and (ii) that the funds, before their transfer to the brokerage accounts, were subject to forfeiture as substitute assets of property "involved in" or "traceable to" money laundering. Again, as with visa fraud, both requirements are plainly satisfied. First, the record reflects ample probable cause to believe that A and Enterprise committed the crime of money laundering [22] by knowingly transferring proceeds earned from visa fraud, a "specified unlawful activity," [23] to their sponsor employers for the purpose of promoting the visa fraud, *i.e.*, to pay these employers for their role in the fraudulent scheme. For instance, it is clear that A and Enter-

prise transferred at least $211,000 to Paul Mederos for his role in signing false labor certifications. Second, there is probable cause to believe that the funds in the Bowman accounts would be subject to forfeiture as property "involved in" money laundering because Enterprise and its property were "used to facilitate" the crime. *See Matai*, 173 F.3d 426, 1999 WL 61913, at *5 (interpreting § 982(a)(1)'s definition of property "involved in" the offense of money laundering to include property that "facilitated" the crime); *United States v. All Monies In Account No. 90–3617–3*, 754 F.Supp. 1467, 1473 (D.Hawai'i 1991) (citing legislative history of § 981(a)) (same). Just as Enterprise itself, and its assets, facilitated the visa fraud scheme, Enterprise and its assets further facilitated money laundering activity by enabling and providing an appearance of legitimacy to the money laundering financial transactions that were executed to promote the same visa fraud scheme. Also, as with visa fraud, the fact that these funds were transferred to movants' accounts is not sufficient to escape forfeiture or preindictment restraint because title to the property vested in the United States at the time of the crime. *See* 21 U.S.C. § 853(c). Thus, the record also establishes all requirements to restrain the funds pre-indictment pursuant to § 853(e)(2) as funds that will be subject to forfeiture upon a conviction of A or Enterprise for money laundering.

Whether the forfeiture analysis begins with probable cause to support a conviction

---

**22.** A person is guilty of money laundering if he (i) conducts or attempts to conduct a financial transaction, (ii) which involves the proceeds of a specified unlawful activity ("SUA"), (iii) knowing that the property represents the proceeds of unlawful activity, and (iv) with the intent to promote the SUA. *See* 18 U.S.C. § 1956(a)(1)(A)(I). In its entirety, 18 U.S.C. § 1956 prohibits "four distinct types of money laundering," including, for example, financial transactions designed to conceal the proceeds of the SUA. *See United States v. Bolden*, 325 F.3d 471, 486 (4th Cir. 2003). To simplify the analysis, only the most pertinent version of money laundering is considered here.

**23.** Visa fraud is a "specified unlawful activity." *See* 18 U.S.C. §§ 1956(c)(7), 1961(1).

for visa fraud or one for money laundering, it ends in the same place: right, title and interest in Enterprise property, including the approximately $125,000 transferred to the Bowman accounts, vested in the United States at the time the crimes were committed and thus the funds are subject to preindictment restraint under § 853(e)(2).

## III.

Movants object to the preindictment restraint of their funds on three grounds, each of which falls short. First, movants argue that the government has failed to meet its burden of demonstrating probable cause to believe that the targets of the investigation, Enterprise and A, were involved in visa fraud or, indeed, any criminal activity.[24] They contend, by counsel, that Enterprise has conducted business with more than 150 sponsoring employers and over 1800 clients most of whom have been appropriately employed. Yet, even assuming that some of Enterprise's business activities may have been legitimate, and the facts presented by the government suggest otherwise, the record nonetheless establishes ample probable cause to believe that Enterprise facilitated significant amounts of illegal activity. Given that probable cause is a "practical, common-sense decision whether, given all the cir-

cumstances set forth … there is a 'fair probability' " to believe that a crime has been committed, it is clear that Special Agent Powell's affidavit and Mederos' plea agreement statement of facts amply establish the requisite "fair probability" to believe that Enterprise and A engaged in visa fraud and money laundering. *See Thomas,* 913 F.2d at 1114.

Next, movants argue that the funds in the Bowman accounts are substitute assets and that substitute assets are not subject to preindictment restraint under § 853(e).[25] This, movants argue, follows from the fact that § 853(e)(1), which authorizes preindictment restraint of forfeitable assets for up to ninety (90) days, makes reference only to "property described in subsection (a) of [§ 853]," [26] and not substitute assets as described in subsection (p), and that § 853(e)(2) should be read in *pari materia* with § 853(e)(1) and similarly exclude substitute property. This argument fails because neither § 853(e)(1) nor § 853(e)(2) should be read to exclude substitute assets. Rather, their provisions must be read in light of § 853(e)'s purpose to preserve the entire class of property that can be forfeited after trial, including substitute assets.[27] The legislative history makes clear, and the Supreme Court has affirmed, that "the sole purpose of § 853's

**24.** Movants mistakenly argue that probable cause was based solely on *legal* arguments presented by the government at the October 13, 2004 hearing, and not on any evidence. To the contrary, the probable cause finding was supported by two extensive affidavits submitted by Special Agent Powell, the investigating agent, and the guilty plea papers of a co-conspirator in the visa fraud conspiracy.

**25.** Worth remembering is that the funds in the Bowman accounts are subject to preindictment restraint not only as substitute assets, but alternatively as property used to facilitate the crimes of visa fraud and money laundering. Thus, even if substitute assets

were not subject to preindictment restraint, this argument would fail to compel the release of the funds at issue.

**26.** *See* 21 U.S.C. § 853(e)(1) ("Upon application of the United States, the court may enter a restraining order or injunction … or take any other action to preserve the availability of property described in subsection (a) for forfeiture under this section …. ").

**27.** *Billman,* 915 F.2d at 921 ("The purpose of [the analogous RICO forfeiture provision] is to preserve pending trial the availability for forfeiture of property that can be forfeited after trial.").

restraining order provision is to preserve the status quo, *i.e.,* to assure the availability of the property pending disposition of the criminal case." *See Monsanto,* 491 U.S. at 613, 109 S.Ct. 2657 (quoting S.Rep. No. 98–225, p. 204 (1983)) (internal quotations omitted). Congress plainly did not intend to carve out from this set of forfeitable assets a subset of forfeitable property not subject to pretrial or preindictment restraint; rather it intended all forfeitable property to be subject to such restraint.

The terms and structure of the forfeiture provisions plainly reflect this Congressional intent. First, by its terms, § 853(e)(2) contradicts movants' interpretation as it is plainly not limited to subsection (a) property, but rather permits the preindictment restraint of any property "subject to forfeiture *under this section,*" *i.e.,* § 853 in its entirety, which, of course, includes subsection (p) substitute property. 21 U.S.C. § 853(e)(2) (emphasis added). Close scrutiny of § 853(e)(1) yields the same conclusion. Although § 853(e)(1) makes reference to property described in subsection (a), in fact, § 853(a)'s definitions do not apply to convictions for visa fraud and money laundering.[28] Instead, it is § 982, together with portions of § 853 incorporated through § 982(b)(1), that de-

fines the relevant set of forfeitable property for visa fraud and money laundering offenses. And, the portions of § 853 that are incorporated include § 853(p), the substitute property provision.[29] In sum, then, the set of forfeitable property subject to pretrial and preindictment restraint in visa fraud and money laundering cases includes substitute property under § 853(p) because that set of property is defined in § 982, which specifically incorporates § 853(p). To read these provisions more restrictively to exclude substitute property is not only textually unwarranted, but also contrary to the overall purpose of § 982 and § 853, which is to preserve, both pretrial and pre-indictment, all property subject to forfeiture in the event of a visa fraud or money laundering conviction. Such a restrictive reading would also run counter to § 853(*o*)'s mandate that "the provisions of [§ 853] shall be liberally construed to effectuate its remedial purposes."[30]

Analogous Fourth Circuit authority supports the result reached here. In *In re Billman,* 915 F.2d 916 (4th Cir.1990), a unanimous Fourth Circuit panel construing a RICO forfeiture provision virtually identical to § 853, concluded that substitute assets are subject to pretrial restraint

---

**28.** Instead of providing its own forfeiture procedures, 18 U.S.C. § 982 incorporates the forfeiture provisions defined in 21 U.S.C. § 853, which was enacted as a part of the Comprehensive Drug Abuse Prevention and Control Act of 1970. *See* Pub.L. 98–473, § 303, 98 Stat.2044. Yet, Congress made unmistakably clear that for the crimes listed in § 982, property subject to forfeiture is also defined in § 982. Thus, Congress plainly did not intend to adopt for visa fraud and money laundering offenses the forfeitable property definitions applicable to drug crimes contained in § 853(a) and (b), as § 982 already provides the appropriate definitions of such property for visa fraud and money laundering.

**29.** Significantly, Congress did not incorporate all of § 853; rather, it explicitly excluded § 853(d) and § 853(p) substitute assets in certain circumstances not present here. *See* 21 U.S.C. § 853(p)(1), (2). In other words, Congress specifically manifested its intent to include subsection (p) assets in the class of assets subject to forfeiture under § 982.

**30.** *See* 21 U.S.C. § 853(*o*); *cf. United States v. McHan,* 345 F.3d 262, 271 (4th Cir.2003) (applying § 853(*o*) to adopt a broad reading of § 853(c)'s relation back provision). *But see McHan,* 345 F.3d at 280 (Luttig, J., concurring) (adopting majority's position but declining to rest the interpretation on § 853(*o*)'s "amorphous direction").

in RICO cases.[31] Specifically, the panel held that § 1963(d)(1)(A), which like § 853(e)(1) is directed to assets subject to forfeiture under subsection (a) of § 1963, must nonetheless be read broadly "in conjunction with [its substitute asset provision] to preserve the availability of substitute assets pending trial."[32] *Billman,* 915 F.2d at 921. In the same way, § 853(e) must here be read along with § 982 and § 853(p) to reach the sensible result that substitute assets may be restrained pre-indictment and pre-trial so that they may be preserved for forfeiture in the event of a conviction.

■ Movants' final argument is that restraint of these funds deprives A of his Sixth Amendment right to counsel because A and his family intend to use the Bowman account funds to finance A's defense. The Supreme Court rejected this argument in *United States v. Monsanto,* 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989), where it held that pretrial restraint of forfeitable assets does not abridge the Sixth Amendment right to counsel if there is a finding of probable cause to believe the funds will be subject to forfeiture upon conviction. *See id.* at 615, 109 S.Ct. 2657; *see also Caplin & Drysdale v. United States,* 491 U.S. 617, 109 S.Ct. 2667, 105 L.Ed.2d 528 (1989) (holding that forfeiture of funds to be used for legal fees does not violate the Fifth or Sixth Amendment); *Billman,* 915 F.2d at 922 (holding that pretrial restraint of substitute assets does not infringe the Sixth Amendment right to counsel). In reaching this result, the Supreme Court reasoned that if an accused's "person" may be restrained upon a finding of probable cause to believe the accused has committed a serious offense, a person's property may also be restrained to ensure its availability for forfeiture. *See Monsan-*

31. The restraining order and substitute assets provisions under 21 U.S.C. § 853(e) and (p) are identical in all relevant respects to the restraining order and substitute assets provisions of 18 U.S.C. § 1963(d) and (m). Thus, courts have often considered these virtually identical provisions interchangeably. *See, e.g., United States v. McHan,* 345 F.3d 262, 272 (4th Cir.2003) (citing *Billman's* interpretation of the "analogous RICO forfeiture statute" to interpret 21 U.S.C. § 853(p)); *United States v. Ripinsky,* 20 F.3d 359, 362 n. 3 (9th Cir.1994) (rejecting pretrial forfeiture of substitute assets but applying 18 U.S.C. § 1963 case law to interpret "substantially identical" provision in 21 U.S.C. § 853); *United States v. Floyd,* 992 F.2d 498, 501 (5th Cir.1993) (same); *Wu,* 814 F.Supp. at 492; *Swank,* 797 F.Supp. at 501. And notably, the Fourth Circuit stated in *Billman* that 21 U.S.C. § 853 and the RICO forfeiture statutes "should be similarly construed." *Billman,* 915 F.2d at 921. Indeed, the legislative history also supports this conclusion. *See* S.Rep. No. 98–225, at 209 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3392 ("This statute [21 U.S.C. § 853] is, in nearly all respects, identical to the RICO criminal forfeiture statute [18 U.S.C. § 1963] . . . .").

32. Movants protest that *Billman's* holding is anomalous and out-dated as other circuits have declined to follow its reasoning. *See United States v. Field,* 62 F.3d 246, 249 (8th Cir.1995) (pretrial restraint of substitute assets not permitted under § 853(e)(1)); *United States v. Ripinsky,* 20 F.3d 359, 363–64 (9th Cir.1994) (same); *United States v. Floyd,* 992 F.2d 498, 502 (5th Cir.1993) (same); *United States v. Gotti,* 155 F.3d 144, 148–50 (2d Cir.1998) (pretrial restraint of substitute assets not permitted under analogous RICO forfeiture provision in 18 U.S.C. § 1963); *In re Assets of Martin,* 1 F.3d 1351, 1359 (3d Cir. 1993) (same). Yet, there is no sign that the Fourth Circuit has abandoned its reasoning in *Billman* or adopted the restrictive reading of these forfeiture provisions favored in other jurisdictions. To the contrary, the Fourth Circuit recently invoked a similarly broad interpretation of § 853 in *United States v. McHan. See* 345 F.3d 262 (applying 853(c)'s relation-back principle to § 853(p) substitute property in order "to effectuate its remedial purposes" despite the text's reference only to "property described in subsection (a)").

*to*, 491 U.S. at 615–16, 109 S.Ct. 2657. The same reasoning applies here where there has been a finding of probable cause to believe that the Bowman account funds will be subject to forfeiture if A or Enterprise are convicted.

Accordingly, the funds in the two Bowman accounts at issue are appropriately subject to preindictment restraint pursuant to 21 U.S.C. § 853(e)(2) and the motion to vacate must be denied.

### IV.

■ Following the entry of the TRO, the government sought successfully to extend the order restraining the Bowman account funds for an additional ninety (90) days pending an indictment pursuant to § 853(e)(1)(B), which provides that property may be restrained pre-indictment after persons with an interest in the property have had an opportunity for notice and a hearing and upon a showing that (i) there is a substantial probability that the United States will prevail on the issue of forfeiture, (ii) that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture, and (iii) that the need to preserve the availability of the funds outweighs the hardship on any party against whom the order is to be entered. All requirements for the issuance of a ninety-day restraining order have been satisfied. First, movants, the owners of the brokerage accounts, were given notice of the TRO and appeared by counsel at an October 13, 2004 hearing. Second, the evidence presented by the government and summarized herein, for reasons already discussed, amply establishes the requisite substantial probability that the United States will prevail on the issue of forfeiture. Next, movants have made clear their intention to liquidate their accounts if not restrained. And finally, the need to preserve the funds outweighs any hardship that will be visited on movants. That movants seek to spend the funds on their father's attorney's fees fails to tip the balance of hardships in favor of movants. As the Supreme Court has stated, "[p]ermitting a defendant to use assets for his private purposes that ... will become the property of the United States if a conviction occurs cannot be sanctioned." *Monsanto*, 491 U.S. at 613, 109 S.Ct. 2657. Thus, because the requirements for preindictment restraint of the Bowman account funds have been satisfied, the funds are appropriately restrained for an additional ninety days.

Movants object that these findings are based, in part, on facts contained in affidavits presented *ex parte* and *in camera*, which movants never had the opportunity to see or to test by cross-examination.[33] Yet, such proceedings are commonplace in ongoing grand jury investigations; indeed, the Fourth Circuit has clearly stated that "in camera proceedings in the context of grand jury proceedings and on-going investigations requiring secrecy are not violative of due process." [34] Of course, this is

---

**33.** The conclusions reached here are also based on the sworn statement of facts made a part of the plea agreement of co-conspirator Paul V. Mederos, which is in the public record. *See United States v. Mederos*, Case No. 1:04cr314 (E.D.Va. July 26, 2004) (Statement of Facts).

**34.** *In re Grand Jury Proceedings*, 33 F.3d 342, 353 (4th Cir.1994) (upholding *in camera* review of evidence establishing crime-fraud ex-

ception to subpoena recipients' attorney-client privilege objection and holding that such review did not violate due process even though subpoena recipient had no opportunity (i) to view the submission or (ii) to offer rebuttal evidence; *see also In re Grand Jury Subpoena*, 884 F.2d 124, 126 (4th Cir.1989) (holding that where government does not intend to disclose grand jury materials, *in camera* proceedings are appropriate to protect govern-

not to suggest that movants could not have presented their own evidence to contradict the conclusions reached here in reliance on the government affidavits, for example, to undermine the conclusion that there is a substantial probability that the Bowman account funds ultimately will be subject to forfeiture. Indeed, as required by § 853(e)(1)(B), movants had an opportunity to present such evidence at the October 13, 2004 hearing, but did not do so. Nor are movants prevented from seeking a *Farmer*[35] hearing at some later date to show that A is entitled to use these assets for his criminal defense if movants or A can prove "by a preponderance of the evidence that the government seized *untainted* assets without probable cause and that [A] needs those same assets to hire counsel." 274 F.3d at 805 (emphasis added).[36] But, in either case, movants must present their own evidence to challenge the preindictment restraint of the funds and may not breach the secrecy of the grand jury proceedings by cross-examining the government's grand jury witnesses or by viewing the affidavits supporting the restraining order. Thus, because the government has established the necessary prerequisites for preindictment restraint of property, and because movants have not adduced any evidence to the contrary, the Bowman account funds are appropriately restrained for an additional ninety days pursuant to § 853(e)(1)(B).

Appropriate orders have issued.

---

ment's interest in secrecy); *In re Grand Jury Subpoena*, 223 F.3d 213, 218–19 (3d Cir.2000) (collecting cases); *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994) ("[W]here an in camera submission is the only way to resolve an issue without compromising a legitimate need to preserve the secrecy of the grand jury, it is an appropriate procedure.") (citing *In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir. 1982)). *But see In re Taylor*, 567 F.2d 1183, 1188 (2d Cir.1977) (holding that government's weak interest in preserving grand jury secrecy did not warrant *in camera* submission where party seeking access to submission would learn of submission contents as soon as he was called as a grand jury witness).

**35.** The Fourth Circuit held in *United States v. Farmer*, 274 F.3d 800 (4th Cir.2001), that a criminal defendant is entitled to a hearing for the limited purpose of determining whether untainted assets have been inappropriately seized when the defendant can establish that the assets are required to hire counsel for his defense.

**36.** Movants, by counsel, represented at a November 23, 2004 hearing that they do not seek a *Farmer* hearing at this time, but they are not precluded from requesting such a hearing in the future if they can establish the requisite threshold showing that A does not have other funds to hire counsel for his criminal defense. *See Farmer*, 274 F.3d at 804.