In re Assets of Tom J. BILLMAN, Petitioner.

UNITED STATES of America, Petitioner–Appellant,

v.

Barbara A. McKINNEY; Robert Budjac; Roselyn Budjac, Respondents–Appellees.

No. 90–7029.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1990.

Decided Oct. 3, 1990.

Joyce K. McDonald (argued), Asst. U.S. Atty., Baltimore, Md. (Breckinridge L. Willcox, U.S. Atty., Barbara S. Sale, Asst. U.S. Atty., Baltimore, Md., on the brief), for petitioner-appellant.

Abbe David Lowell (argued), Brand & Lowell, Washington, D.C. (Ross A. Nabatoff, Brand & Lowell, Washington, D.C., Eugene Gressman, Seton Hall University School of Law, South Orange, N.J., on the brief), for respondents-appellees.

Before POWELL, Associate Justice, Retired, United States Supreme Court, sitting by designation, HALL, Circuit Judge, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

The principal issue in this appeal is whether 18 U.S.C. § 1963 empowers a district court to enjoin, pending a criminal trial and forfeiture proceedings, the disposition of substitute assets that a fugitive RICO defendant transferred to a third person. The district court denied an injunction, holding that the statute provides authority to restrain prior to trial only those assets which the government proves are connected to the fugitive's alleged racketeering activity. Because we believe that the district court's dismissal of the petition filed by the United States reflects an impermissibly narrow construction of RICO forfeiture provisions, we reverse.

## I

There is little dispute about the facts. The controversy arises out of the transfer of money by Tom J. Billman, a fugitive, to Barbara A. McKinney, who is subject to the personal jurisdiction of the court. A grand jury indicted Billman, McKinney, and another individual for conspiracy to commit mail and wire fraud and for numerous counts of fraud that caused the failure of Community Savings and Loan Association of Bethesda, Maryland. The indictment charged that Billman and McKinney "transferred to Swiss bank accounts proceeds from the conspiracy and scheme and artifice to defraud for the purpose of concealing their ill-gotten gains." Billman—but not McKinney—was indicted for racketeering. The indictment also charged that the proceeds derived from the racketeering

activity were forfeit pursuant to 18 U.S.C. § 1963(a)(1) and (3).

Before the grand jury returned the indictment, Billman fled the country. The government has been unable to locate him, but McKinney had frequent conversations with him on phones that had been lawfully tapped.

On May 9, 1989, McKinney received an overseas call from Michael Byrd, a London solicitor, who informed her that he and she had a "mutual client." Byrd said, "I'm hoping to receive in the coming week some money, which, ah, I will be forwarding to you." Byrd added that he was not "in funds myself yet, but as soon as I am, I'll arrange the appropriate transfer." Byrd later told an agent from New Scotland Yard that Billman was his client.

Eight days after Byrd's call, a wire transfer of $499,935.89, originating at Barclay's Bank in London from Byrd's law firm, was credited to an account in the name of McKinney and her mother, Roselyn Budjac, at Comerica Bank in Detroit. The day after the wire transfer, McKinney received a brief, cryptic telephone call from Billman. He said, "It's my understanding that the eagle has flown and landed on your end. Is that correct?" McKinney responded that she had not heard, to which Billman replied, "It should be done, so-ah, normal tomorrow." Billman later added, "Yeah, 703," and concluded the call with "I'll talk to you tomorrow, babe."

From this coded conversation and previously intercepted conversations, postal inspectors determined that Billman and McKinney were setting up a further telephone conversation at a "safe" location within the "703" area code of northern Virginia. The district court authorized a tap to intercept that conversation. Billman called McKinney the next day on the "703" telephone, and they spoke at length about the wire transfer. When Billman asked, "Did you get the money?" McKinney replied, "Yes ... I got word this morning." Billman then said, "Hope your mother didn't call you on an open line." McKinney responded that she had called her parents from "some place else." Billman apolo-gized for taking so long to effect the wire transfer, and they subsequently discussed how McKinney would use the money. McKinney said that she intended to repay her parents and to pay a $25,000 settlement to "Brickley," a reference to *Brickley v. EPIC*, a case pending in the district court, which McKinney had recently settled for $25,000. Billman then cautioned that McKinney should "make sure, be careful where you get the Brickley money from," and they discussed that she might borrow the money from a friend or her parents. Billman later asked, "Is McKnew still paying you?" and McKinney answered, "Well, I hope so. I'll wait and see."

According to bank records, McKinney's mother withdrew $500,368.81 from the Comerica account on May 19, 1989, and closed that account. McKinney's parents distributed the money among other accounts and certificates of deposit. McKinney later phoned her parents that she would be at Mabel's place the next day. McKinney's father replied, "Oh, well, good, ah, ah, we took care of the photos and, ah, I, ah, five photos, and I sent the negatives to Mabel. I mailed them, ah, yesterday.... Everything went smooth as silk...." McKinney's mother later stated that "we increased, ah, ah, the return." When McKinney said, "I've got to be able to get to" the money "without a penalty," her mother answered, "Well, you can ... so far as I know."

Bank records also reveal that William C. McKnew was making regular payments of $6,250 to McKinney. The money came from a business transaction between McKnew, Billman, and Europlan Holdings, Ltd., a company located on the Channel Island of Jersey. Michael Dee, a director of Europlan, provided oral and written statements to New Scotland Yard concerning the McKnew transactions. Dee stated that Billman introduced McKnew and Dee. When Europlan subsequently invested $80,-000 in McKnew's business, Billman gave Europlan the option of selling its McKnew stock to Billman in three years, at Europlan's cost. Billman subsequently bought Europlan's shares in McKnew's company

but requested that the shares remain registered in Europlan's name, with Europlan acting as a "bare trustee or nominee" for Billman.

McKnew later bought the shares from Billman for $80,000, and Billman directed Dee to transfer the shares in exchange for McKnew's promissory note. However, in April 1989, Billman and McKnew agreed to vary the terms of the sale. Instead of paying $80,000 in 1993, McKnew agreed to make eight monthly payments of $6,250 to McKinney. As Dee stated to an officer of New Scotland Yard, "I felt this transaction very strange as Billman was losing a lot of money from it. I was of the opinion that he did not want the money traceable." McKnew had made four payments to McKinney by the time this litigation commenced. Although the source of the McKnew payments had been carefully laundered at great expense to Billman, it is apparent that McKnew was discharging a debt he owed to Billman by paying McKinney. The debt and subsequent payments were among Billman's assets.

## II

The district court entered a temporary restraining order that prohibited McKinney and her parents from disposing of the wire transfer of $499,935.89 and the transfers of $50,000.00 made or being made by McKnew. The parties agreed to extend the TRO until further order of the court. Subsequently, McKinney requested the district court to determine the validity of the TRO, and the United States moved for entry of an injunction restraining expenditure of the funds pending forfeiture proceedings.

At the hearing before the district court, the government proved that Billman and other conspirators transferred $22,000,000 to Swiss bank accounts. The government, however, was unable to trace the funds from the Swiss bank accounts to Barclay's Bank or to Europlan. It proved the transfer of the funds in issue to McKinney by introducing tapes of the intercepted phone calls. Dee's affidavit established the source of the McKnew payments. The evidence also disclosed that Billman had suffi-

cient assets apart from the alleged theft of Community's deposits to make the payments in issue to McKinney.

The district court held that § 1963 did not authorize a pretrial injunction to restrain assets transferred by the defendant to a third party when the assets were not proved to be proceeds of a RICO offense. It found that the government had failed to prove that these funds were actual RICO proceeds. It also found that after the transfer of the funds, they belonged to McKinney. The court denied the injunction, vacated the TRO, and dismissed the government's petition. The district court's decision is consistent with the only reported case that deals with pretrial restraint of substitute assets in the hands of a third person. *United States v. Chinn*, 687 F.Supp. 125 (S.D.N.Y.1988).

## III

The government may "seize property based on a finding of probable cause to believe that the property will ultimately be proven forfeitable." *United States v. Monsanto*, —— U.S. ——, 109 S.Ct. 2657, 2666, 105 L.Ed.2d 512 (1989).

■ The probable cause found by the grand jury satisfies the government's burden of proving the allegations of the indictment. This is evident from the legislative history of the Comprehensive Crime Control Act of 1984, which explains: "For the purposes of issuing a restraining order, the probable cause established in the indictment or information is to be determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based." S.Rep. No. 225, 98 Cong., 2d Sess. 203, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3386. Also, the court may admit hearsay evidence at a pretrial restraining hearing. *See* § 1963(d)(3).

There can be no doubt that Billman was the source of the funds sent to McKinney through his solicitor and through the Europlan transaction. The manner in which the funds were laundered, the use of codes and phones perceived to be safe, and the fur-

ther laundering of the money for the Brickley settlement are facts that would justify the inference that the funds were part of the $22,000,000 deposited in Swiss banks. These facts would also justify the inference that the tainted funds were not Billman's to give away.

Nevertheless, the district court drew contrary inferences and we are bound by its findings. *See Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Therefore, we are compelled to conclude for the purpose of this case that the source of the funds was money which Billman did not steal from Community.

### IV

■ Title 18 U.S.C. § 1963(a)(1) and (3) provides:

(a) Whoever violates any provision of section 1962 of this chapter ... shall forfeit to the United States, irrespective of any provision of State law—

(1) any interest the person has acquired or maintained in violation of section 1962;

\* \* \* \* \* \*

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

A RICO forfeiture pursuant to this statute is not an *in rem* proceeding against guilty assets. The forfeiture is, instead, an *in personam* proceeding against the defendant, and the forfeiture constitutes partial punishment for the offense. *See United States v. Conner,* 752 F.2d 566, 576 (11th Cir.1985). The government is not required to trace the proceeds of the RICO offense into a specific bank account in order to execute a forfeiture judgment. *United States v. Robilotto,* 828 F.2d 940, 949 (2d Cir.1987). Instead, a forfeiture money judgment can be satisfied out of any of the defendant's assets. *United States v. Ginsburg,* 773 F.2d 798, 800–03 (7th Cir.1985).

■ These principles are embodied in an amendment to the Act, 18 U.S.C. § 1963(m), which makes provision for the forfeiture of substitute assets:

(m) If any of the property described in subsection (a), as a result of any act or omission of the defendant—

\* \* \* \* \* \*

(3) has been placed beyond the jurisdiction of the court;

\* \* \* \* \* \*

the court shall order the forfeiture of any other property of the defendant.... 

The indictment alleges that Billman has placed the funds of the defrauded savings and loan in Swiss banks—that is, beyond the jurisdiction of the court. Consequently, after Billman's conviction the district court would be authorized by § 1963(m)(3) to order forfeiture of his substitute assets.

McKinney's possession of Billman's substitute assets would not defeat the government's entitlement to forfeiture after Billman's conviction. Section 1963(c) protects only those transferees of assets who can establish status as "a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section." McKinney has presented insufficient evidence to show that she qualifies as a bona fide purchaser for value without cause to believe that the substitute assets in her hands were subject to forfeiture. The question remains whether the substitute assets can be restrained pending trial.

### V

■ Section 1963(d)(1)(A) provides:

(d)(1) Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) for forfeiture under this section—

(A) upon the filing of an indictment or information charging a violation of section 1962 of this chapter and alleg-

ing that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section. . . .

The purpose of § 1963(d)(1)(A) is to preserve pending trial the availability for forfeiture of property that can be forfeited after trial. *See United States v. Regan,* 858 F.2d 115, 119 (2d Cir.1988). Although reference is made in subsection (d)(1) to property described in subsection (a), we believe that when, as here, the defendant has placed the assets specified in subsection (a) beyond the jurisdiction of the court, subsection (d)(1)(A) must be read in conjunction with subsection (m) to preserve the availability of substitute assets pending trial. In this way the purpose of § 1963(d)(1)(A) can be attained. A district court, construing analogous provisions dealing with forfeiture arising out of trafficking in drugs, has reached the same conclusion with respect to substitute assets held by the defendant. *See United States v. Skiles,* 715 F.Supp. 1567 (N.D.Ga.1989).

Although neither the Supreme Court nor any court of appeals has addressed the question of pretrial restraint of substitute assets that have been transferred to a third person, two opinions of the Court afford us guidance. In *Russello v. United States,* 464 U.S. 16, 26–27, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983), the Court, considering the proper construction of the forfeiture provisions of § 1963, emphasized that Congress intended that the statute "shall be liberally construed to effectuate its remedial purposes." In the context of the case before us, the remedial purpose of the Act is to preserve the defendant's assets for ultimate forfeiture if he is convicted. Liberal construction of § 1963 requires reading its several subsections together, rather than in isolation, to achieve the congressional purpose of pretrial restraint.

*United States v. Monsanto, supra,* dealt with the pretrial restraint of assets that were directly traced to violations of laws prohibiting distribution of heroin. Speaking of assets in the hands of third persons, the Court reasoned that if there was probable cause to believe that these assets could be forfeited in postconviction proceedings, pretrial restraint was permissible. 109 S.Ct. at 2666. It reached this conclusion by reading the provisions of the drug forfeiture statute together instead of in isolation. 109 S.Ct. at 2664–65. The Court admonished: "Permitting a defendant to use assets for private purposes that, under [21 U.S.C. § 853(c) ], will become the property of the United States if a conviction occurs, cannot be sanctioned." 109 S.Ct. at 2665. We have previously noted that the drug and RICO forfeiture statutes should be similarly construed. *See United States v. Amend,* 791 F.2d 1120, 1127 n. 6 (4th Cir. 1986). Therefore *Monsanto* confirms our conclusion that § 1963(d)(1)(A) should be construed to authorize pretrial restraint of those assets specified by subsections (a) and (m) that can be forfeited after conviction.

In summary, we hold that the pretrial restraining provisions of § 1963 do not permit a defendant to thwart the operation of forfeiture laws by absconding with RICO proceeds and then transferring his substitute assets to a third person who does not qualify as a bona fide purchaser for value.

### VI

McKinney contends that the continued restraint of funds violates her right to counsel secured by the Sixth Amendment. She argues that the funds were indemnification from EPIC, a corporation in which she served as an officer and director. EPIC was one of Billman's many corporations that are charged in the indictment as being an association in fact constituting a RICO enterprise. The indictment alleges that Billman and McKinney used Community's deposits to fund EPIC.

■ McKinney's claim is not supported by the evidence. The indictment alleges that she and another conspirator extracted $644,000 from Community and its subsidiaries and $850,000 from EPIC and related companies for their personal legal fees. McKinney did not testify, and she did not account for this money. In any event, there is no evidence that at the time of the transfer EPIC had any funds. Nor did

McKinney prove that EPIC authorized the clandestine transfer of funds through Billman's solicitor and Europlan. Quite properly the district court made no finding that EPIC was the source of the funds the government seeks to restrain. We, too, cannot accept the theory McKinney spins in an effort to give a legitimate gloss to the funds she received from Billman.

 In *Caplin & Drysdale v. United States*, — U.S. —, 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989), the Court explained: "The forfeiture statute does not prevent a defendant who has nonforfeitable assets from retaining any attorney of his choosing." McKinney's reliance on this statement is misplaced. The funds in issue are not nonforfeitable assets. They are Billman's substitute assets, which § 1963(m) subjects to forfeiture. The government can forfeit a defendant's contraband assets without infringing his Sixth Amendment right to counsel. *See Caplin & Drysdale*, 109 S.Ct. at 2651–56. Moreover, restraint pending forfeiture can be imposed pretrial. *Monsanto*, 109 S.Ct. at 2665–66.

McKinney's reliance on *United States v. Noriega*, 746 F.Supp. 1541 (S.D.Fla.1990), is also misplaced. The court's order setting that case for hearing disclosed that, without judicial proceedings, the government restrained Noriega's assets. The issue before the court was "whether the government may deprive a criminal defendant of his only assets available for attorneys' fees without any showing that the assets are connected to illegal activity, and without affording the defendant an opportunity to contest the seizure." Here, in contrast, the government followed statutory procedures to seek restraint of the funds transferred to McKinney and afforded her a full opportunity to contest the government's claim.

## VII

 McKinney also argues that the restraint of funds "for the unlimited duration likely in this case" violates the Due Process Clause. She complains that as long as

Billman eludes the government, the funds will be frozen.

In *United States v. $8,850*, 461 U.S. 555, 564–66, 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143 (1983), the Court held that the principles explained in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), are appropriate for determining the reasonableness of delayed forfeiture proceedings. One of the factors discussed in *Barker* is the reason for delay. Delay caused by the defendant is weighed less heavily than delay caused by the government. 407 U.S. at 531, 92 S.Ct. at 2192.

Delay resulting from Billman's flight cannot be attributed to the government. McKinney aided him by assisting in the transfer of Community's funds abroad. She presently sustains him as a fugitive by forwarding messages left for him on an answering device. She is in no position to complain about the government's inability to bring him to trial.

The judgment of the district court is reversed, and the case is remanded for entry of an appropriate injunction. The mandate shall issue forthwith.