UNITED STATES of America,

v.

Arkadiy **BANGIYEV**, Defendant.

Case No. 1:14–cr–206.

United States District Court, E.D. Virginia, Alexandria Division.

Signed Oct. 28, 2015.

Kimberly Riley Pedersen, United States Attorney's Office, Alexandria, VA, for United States of America.

Charles Burnham, Burnham and Gorokhov PLLC, Washington, DC, for Defendant.

## AMENDED ORDER

LIAM O'GRADY, District Judge.

This matter comes before the Court on the Government's Motion for Preliminary Order of Forfeiture. Dkt. 601. The Government moves to have the individual defendant Arkadiy Bangiyev ("Arkadiy") for-

feit at least $20,000,000.00 and several specific assets. Dkts. 683, 694-9-10. For the reasons set forth below, the Motion as to Arkadiy is GRANTED in part.

## I. Background

From 2004 until 2014, a criminal organization manufactured counterfeit United States currency representing tens of millions of dollars. The United States Secret Service ("USSS") identified defendant Arkadiy Bangiyev ("Arkadiy") as a member of this enterprise after conducting a lengthy investigation that included approximately nine months of court authorized phone wiretaps. On August 7, 2014, a grand jury returned a two count indictment against Arkadiy and others whom the USSS had also identified as being involved in the criminal organization. Dkt. 203. Count One of the Superseding Indictment charged Arkadiy with participating in a Racketeer Influenced and Corrupt Organization (RICO) conspiracy in violation of 15 U.S.C. § 1962(d). Id. Count Two charged Arkadiy with participating in a conspiracy to commit counterfeiting offenses in violation of 18 U.S.C. §§ 371, 471, 472, 473, and 474. Id. Also included in the Superseding Indictment was a forfeiture allegation advising the defendants that if they were convicted of Count One the Government would seek the forfeiture of various property the defendants acquired or maintained in violation of 18 U.S.C. § 1962. Id. at 22.

On January 15, 2015, Arkadiy pled guilty to Count One of the Superseding Indictment. Dkt. 505. A written plea agreement was entered in which Arkadiy agreed to "forfeit all interests in any asset derived from counterfeiting or racketeering that the defendant owns or over which the defendant exercises control, directly or indirectly, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of his offense." Id. at

9. On April 20, 2015, the Government moved for a Preliminary Order of Forfeiture against each of the defendants, Itzhak Loz, Ronen Fakiro, Boaz Borohov, Ofra Borohov, Arkadiy Bangiyev, Eduard Bangiyev and Johnny Lee, seeking the entry of money judgments up to $70,474,250 with joint and several liability against each of the defendants. Dkt. 601. The Government contends that this sum represents the illegal proceeds that these defendants obtained during the course of the RICO conspiracy. Id. The Government argues that Arkadiy reasonably knew about $20,000,000 of the proceeds and, accordingly, moves now for a money judgment against him in that amount. In addition, the Government moves for the forfeiture of several specific assets.

## II. The Applicable Criminal Forfeiture Law

The procedure for forfeiture of assets in a criminal case is governed by Federal Rule of Criminal Procedure 32.2. Under this Rule, in order for a court to enter a judgment of forfeiture following a finding of guilt or a guilty plea, the Government must first have notified the defendant, either through the indictment or the information, of its intent to seek forfeiture as part of any sentence. Fed. R. Crim. Pro. 32.2(a). If this notice requirement is satisfied, the government may then pursue a forfeiture order by demanding either specific property, a money judgment, or substitute property. See Fed. R. Crim. Pro. 32.2(b)(1)(A) & (b)(2)(A). In cases where the government seeks specific property, "the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. Pro. 32.2(b)(1)(A). When the government seeks a money judgment, "the court must determine the amount of money that the defendant will be ordered to pay." Id.

■ Whether property is subject to forfeiture in a particular case is governed by "the applicable statute." Fed. R.Crim. Pro. 32.2(b)(1)(A). Title 18 U.S.C. § 1963 is the applicable forfeiture statute for RICO violations. The RICO forfeiture statute is mandatory, *Alexander v. United States,* 509 U.S. 544, 562, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), and broad, *United States v. Cherry,* 330 F.3d 658, 669 n. 18 (4th Cir.2003). The Fourth Circuit has observed that the RICO statute contains what is "by far the most far reaching forfeiture provision, sweeping far more broadly than the substantive RICO offense itself." *Id.* In addition, a judgment of forfeiture in a RICO case is not a separate conviction; rather, it constitutes part of a defendant's sentence. 18 U.S.C. § 1963 (forfeiture is imposed "in addition to any other sentence" for a violation of the RICO Act); *see also Libretti v. United States,* 516 U.S. 29, 39, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995).

■ Under 18 U.S.C. § 1963, a defendant who has been found guilty or who has pled guilty to a RICO violation must forfeit to the United States:

(1) any interest the [RICO violator] has acquired or maintained in violation of section 1962;

(2) any—

(A) interest in;

(B) security of;

(C) claim against; or

(D) property or contractual right of any kind affording a source of influence over;

any enterprise which the [RICO violator] has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the [RICO violator] obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

18 U.S.C. § 1963(a). Section (m) of this statute also provides for the forfeiture of substitute assets:

(m) If any of the property described in subsection (a), as a result of any act or omission of the defendant—

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs (1) through (5).

*Id.* § 1963(m). In essence, under § 1963, a court may order the forfeiture of four categories of assets: (1) assets the defendant acquired or maintained in violation of the RICO Act; § 1963(a)(1); (2) any interest in and all property of any kind affording the defendant a source of influence over the RICO enterprise, *id.* § 1963(a)(2); (3) all property constituting or derived from proceeds of the racketeering activity, *id.* § 1963(a)(3); and (4) substitute assets up to a certain amount, *id.* § 1963(m). However, the analysis does not stop there. "Any interests in an enterprise, including the enterprise itself, are subject to forfeiture in their entirety, regardless of whether some portion of the enterprise is not tainted by the racketeering activity." *United States v. Angiulo,* 897 F.2d 1169, 1211 (1st Cir.1990). In contrast, the forfeiture of interests outside the enterprise, including "property that affords a source

of influence over an enterprise," is subject to a rule of proportionality. *Id.; see also United States v. Porcelli,* 865 F.2d 1352, 1362–65 (2d Cir.1989), *United States v. Horak,* 833 F.2d 1235, 1242–43 (7th Cir. 1987). Under this rule, interests outside the enterprise "are only subject to forfeiture to the extent they are tainted by the racketeering activity." 897 F.2d at 1211.

■■■ Forfeiture in a RICO case is not an *in rem* proceeding against certain assets; rather, it is an *in personam* proceeding against the defendant. *In re Billman,* 915 F.2d 916, 920 (4th Cir.1990). Thus, "the government [ ] may pursue a forfeiture order by demanding either a money judgment, specific property, or substitute property." *United States v. Poulin,* 690 F.Supp.2d 415, 420 (E.D.Va.2010) *aff'd,* 461 Fed.Appx. 272 (4th Cir.2012). In order to obtain a forfeiture money judgement, "[t]he government is not required to trace the proceeds of the RICO offense into a specific bank account." *In re Billman,* 915 F.2d at 920. Rather, the statute requires forfeiture of the total profits of criminal activity, regardless of whether those funds are still in the defendant's possession. *United States v. Ginsburg,* 773 F.2d 798, 802–03 (7th Cir.1985); *see also, United States v. Amend,* 791 F.2d 1120, 1128 n. 6 (4th Cir.1986) ("The *Ginsburg* reasoning is persuasive, and the government need not have offered evidence that the forfeitable assets were still in existence at the time of [the defendant]'s conviction."). Pursuant to 18 U.S.C. § 1963(m), the provision for the forfeiture of substitute assets, "a forfeiture money judgment can be satisfied out of any of the defendant's assets." *In re Billman,* 915 F.2d at 920.

■■■In the context of a conspiracy, forfeiture extends to funds obtained by a defendant's conspirators that were reasonably foreseeable and part of the jointly undertaken criminal activity. Conspirators are responsible, both substantively and at sentencing, for the "reasonably foreseeable acts and omissions" of their co-conspirators committed "in furtherance of the jointly undertaken criminal activity." *United States v. McHan,* 101 F.3d 1027, 1043 (4th Cir.1996) (quoting U.S.S.G. § 1B1.3(a)(1)(B)) (applying vicarious liability principles to criminal forfeiture in drug distribution case). Because forfeiture is "an element of the [defendant]'s sentence," *Libretti v. United States,* 516 U.S. 29, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995), it follows that conspirators are also responsible for the reasonably foreseen proceeds obtained by their co-conspirators. *McHan,* 101 F.3d at 1043; *United States v. Hurley,* 63 F.3d 1, 22 (1st Cir.1995) (applying this reasoning in the context of a RICO violation).

### III. Burden of Proof

■■■ This Court next addresses the standard of proof for a RICO forfeiture. The parties disagree over what standard the Court should apply to this Motion. For the reasons stated below, the Court finds that preponderance of the evidence is the proper standard.

■■■ The Supreme Court has made clear that forfeiture is an aspect of the defendant's sentence, not an element of the underlying crime. *Libretti v. United States,* 516 U.S. 29, at 38–39, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995). The Supreme Court has also instructed that district courts should use a preponderance of the evidence standard when making factual determinations bearing on punishment. *See United States v. Watts,* 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). Because a forfeiture is part of a defendant's punishment, it follows that a preponderance of the evidence standard is the appropriate standard to apply to forfeiture. Therefore, a district court or jury

making a forfeiture determination need only find facts warranting forfeiture by a preponderance of the evidence. *See United States v. Christensen*, 801 F.3d 970 (9th Cir.2015); *United States v. DeFries*, 129 F.3d 1293, 1312 (D.C.Cir.1997). The Fourth Circuit embraced this line of reasoning in *United States v. Najjar*, 300 F.3d 466 (4th Cir.2002). Although the Fourth Circuit has also indicated in dicta that it has not yet definitively held that preponderance of the evidence is the proper standard, *see United States v. Cherry*, 330 F.3d 658, 669 n. 18 (4th Cir.2003), this Court is persuaded by the line of reasoning set out above and choses to follow the preponderance standard now.

## IV. Specific Forfeiture Requests

The Government seeks forfeiture of several specific assets plus a money judgment against Arkadiy in the amount of $20,000,000. The money judgement will ultimately be reduced by the net amount of money that is realized by the United States upon the final forfeiture of assets that are subject to forfeiture primarily as proceeds of the RICO conspiracy. In Part IV.A., the Court will address the $20,000,000 money judgment. In Part IV. B., the Court will address assets the Government argues should be forfeited as property affording Arkadiy a source of influence over the conspiracy. In Part IV. C., the Court will address assets the Government argues should be forfeited as proceeds of the conspiracy.

*A. Reasonably Foreseeable Proceeds for Arkadiy: Money Judgment in the Amount of $20,000,000*

■ The Government first seeks a money judgment in the amount of $20,000,000 minus the value of specific assets that are subject to forfeiture as proceeds. The evidence, as outlined below, establishes that the RICO conspiracy, of which Arkadiy was a member, manufac-

tured over $70,000,000. The evidence further confirms that Arkadiy reasonably knew about at least $20,000,000 as he was involved at the higher levels of the conspiracy and financed some of the operations. Accordingly, the Court finds that $20,000,000 is the appropriate forfeiture amount in this case.

The facts that Arkadiy has admitted support a finding that the criminal enterprise manufactured massive amounts of counterfeit bills. The conspiracy ran for over a decade, beginning in 2004 and continuing until May of 2014. Dkt. 506. This criminal enterprise engaged in the counterfeiting of United States currency, money structuring, and other crimes. *Id.* The enterprise made false $100 and $50 Federal Reserve notes and passed, pushed, and sold these forged notes with the intent to defraud. *Id.* From 2004 until 2014, Arkadiy regularly obtained large quantities of counterfeit currency from Yakub Yusopov and/or Itzhak Loz and sold it to others. *Id.*

Further, the money the USSS has tracked and the manufacturing equipment the USSS found during the investigation of this criminal enterprise is consistent with a large counterfeiting operation. The USSS recovered from the New Jersey warehouse two computers belonging to Loz which contained over 3,000 digital images of United States currency and its security features, including the front plate, back plate, Treasury seal, watermark portraits, serial numbers, security thread and blue 3–D ribbon. Dkt. 601–1, ¶ 60. Further, according to USSS data, the amount of counterfeit $50 and $100 bills passed and seized in the United States from fiscal year 2004 through April 20, 2015, that are associated with the particular notes in this case—as well as the digital images from Loz's computers and the printing plates and transparencies seized from the warehouse—was $70,474,250. Dkt. 632–3.

In addition, Loz maintains that from 2008 until 2011, he manufactured in Israel and distributed to the Bangiyev brothers in the United States an average of $2,500,000 to $3,000,000 worth of counterfeit $100 bills every three months. The counterfeit bills were packed inside "shrink wrapping machinery." This is confirmed by the records obtained from U.S. Customs and Border Protection. Beginning around 2004, and continuing throughout the length of the conspiracy, Loz used the services of A.M. Ventura, an Israeli printing company, to ship containers of "shrink wrapping machinery." Loz used the name of Universal Auto of Los Angeles, California, on the shipping records to facilitate the imports. The Customs records show that, beginning as early as 2004, Universal Auto imported the machinery from A.M. Ventura approximately every three months. *See* Dkt. 632–4.

Next, the evidence suggests that Arkadiy knew about and was involved in the manufacturing of $9,500,000 worth of counterfeit $50 bills at 13 Sylvester Street, Westbury, New York, in 2007. Arkadiy admits that on April 20, 2006, he leased the Sylvester Street premises along with his brother, Eduard Bangivey ("Eduard"), on behalf of Elegant Jewelry Inc. of 1083 Old Country Rd., Westbury, New York. Dkt. 506, at 4. Arkadiy used the HSBC bank account for Elegant Jewelry to pay the security deposit and rent for 13 Sylvester Street. *See* Dkt. 683–7. Arkadiy further admits that Loz used the Sylvester Street property to manufacture counterfeit money from June 2006 until March 2007. Dkt. 506, at 4. He also admits that he knew that Loz had nine printing machines and accessories imported from Israel and ordered a host of printing supplies for this counterfeiting operation. *Id.* at 5. According to Loz, Arkadiy was at the 13 Sylvester Street plant daily and supervised everybody else who was there. In addition,

the owner of the business located next to 13 Sylvester Street positively identified two photographs of Arkadiy.

Arkadiy further admits that between January and March of 2007, he obtained counterfeit $50 bills manufactured by Loz and supplied them to Devon Bost. Dkt. 506, at 5. On the night of March 19, 2007, Devon Bost contacted Eduard to arrange a purchase of counterfeit currency. *Id.* Eduard contacted Arkadiy to notify him. *Id.* Arkadiy obtained the currency from Yusopov and then sold Bost $100,000 in counterfeit $50 bills. *Id.* Immediately after Bost took a bag containing the counterfeit bills from inside Arkadiy's car, Arkadiy was arrested. *Id.* Arkadiy's fingerprints were later found on the counterfeit $50 notes. Based on these facts, the Court can conclude that Arkadiy was well aware of all of the counterfeit currency produced at Sylvester Street.

After this arrest, Arkadiy was convicted at trial on a counterfeiting charge and sentenced in 2008 to five years of probation and a $30,000 fine. Nevertheless, Arkadiy resumed his counterfeiting activities not long after this incident. According to Loz, he began to sell counterfeit to Arkadiy again in 2008. This is corroborated by structured cash deposits Arkadiy made into Loz's Bank of America accounts from December of 2008 until May of 2009. Dkt. 632–22. According to Loz, in the years that followed, Arkadiy continued to deal in counterfeit currency with him. There is some evidence to corroborate this. For example, in March 2011, at Loz's request, Arkadiy sent Loz via Fed Ex "bar code ink" used to simulate a security feature of genuine U.S. currency.

The Government argues that, in addition to the between $30,000,000 and $36,000,000 imported from Israel by Loz, and the $9,500,000 manufactured at Sylvester Street, Arkadiy was aware of the

$2,560,000 worth of $100 bills that were printed in 2014 at the New Jersey warehouse and seized from Loz's New York storage unit. However, the Government has not presented sufficient facts tying Arkadiy to this particular part of the conspiracy.

The defendant's evidence in support of a lower foreseeable proceeds figure comes from Arkadiy's and Eduard's statements and the currency generated by A.K. 47th Street Buyers Inc., Westbury Jewelry Exchange, and Elegant Jewelry, companies run by Eduard and Arkadiy. *See* Dkts. 693–9, 10, 11, 12. While these exhibits identify large quantities of currency running through these businesses, there is no evidence identifying the source of the funds. The inability or decision not to admit evidence tracing the origins of the funds allows both parties to argue their respective theories. As discussed herein, the Government has shown that at least some of the funds are counterfeit currency or proceeds of counterfeit currency sales. Therefore, the defense that the funds represent legitimate sales of jewelry and account for the purchasing power of Arkadiy for real estate and personal property is of little evidentiary value to the Court in determining this forfeiture action. In addition, bank records show that Westbury Jewelry Exchange and Elegant Jewelry wired large amounts of money to Loz's Bank of America account. These money transfers are left unexplained. What is uncontested are the tax returns filed by Arkadiy and Eduard demonstrating that little profit came from the businesses.

The Government has presented records and testimony that demonstrate that tens of millions of dollars was generated by the conspiracy as a whole. The Government's evidence also shows Arkadiy was significantly involved in the financing, manufacturing, and distribution of the counterfeit money. This Court found in a previous order that Arkadiy knew that between $7,000,000 and $20,000,000 was generated by the conspiracy. Dkt. 640. Based on the evidence as outlined above, the Court finds that a money judgment at the highest end of this range is appropriate.

*B. Assets Subject to Forfeiture Primarily Because of their Use in Furtherance of the RICO Conspiracy*

The Government next seeks forfeiture of specific assets that afforded Arkadiy a source of influence over the conspiracy.

*1. Items Held By or In the Name of A.K. 47*

■ The Government seeks forfeiture of the following three things held by or in the name of A.K. 47th Street Buyers, a gold refinery business in Manhattan's diamond district:

a. Approximately $71,494.00 in U.S. currency seized on May 28, 2014, from the business premises of A.K. 47th Street Buyers at 74 West 47th Street in New York, New York;

b. Approximately $77,707.00 worth of jewelry, coins, and gemstones, seized on May 27, 2014, from the business premises of A.K. 47th Street Buyers at 74 West 47th Street in New York, New York; and

c. Approximately $4,824 in the account ending in 6249 at PNC Bank, held in the name of A.K. 47th Street Buyers.

These three items are all subject to forfeiture by Arkadiy. Arkadiy owned and operated A.K. 47. Income tax returns for A.K. 47 show that in 2012, Arkadiy was the sole officer of A.K. 47 and owned all of its stock. Phone calls intercepted during the investigation reveal that A.K. 47 was used to store money during the conspiracy. In addition, at least once a courier picked up genuine money from A.K. 47 that would be used to pay Loz for counterfeit currency.

A.K. 47 also gave the appearance that the Bangiyev's were engaged in a legitimate business, for example, by providing a plausible explanation for their possession and storage of large amounts of cash. These facts establish that the A.K. 47 property afforded Arkadiy a source of influence over the RICO enterprise and, therefore, that it is subject to forfeiture under 18 U.S.C. § 1963(a)(2).

The only A.K. 47 property Arkadiy, through Eduard's brief in opposition to the Government's Motion for Preliminary Order of Forfeiture,[1] argues should not be forfeited is the money in the PNC account. Arkadiy argues the Government has not established the requisite nexus between this bank account and the RICO enterprise. The Government has established, however, that A.K. 47, and its assets, generally afforded Arkadiy a source of influence over the conspiracy. Therefore, the company, and its assets, are subject to forfeiture under § 1963(a)(2). *See United States v. Angiulo,* 897 F.2d 1169, 1215 (1st Cir.1990) (holding that defendant's interest in a café was subject to forfeiture where defendant held meetings at café to discuss racketeering activities). Even if only a portion of the company afforded Eduard a source of influence over the conspiracy, which Eduard does not argue, the remainder of the company would still be subject to forfeiture under 18 U.S.C. § 1963(a)(3) as proceeds of the conspiracy and under 18 U.S.C. § 1963(m) as substitute assets.

### 2. Items Held By or In the Name of M & A Star Realty, LLC

a. *Real Property Known as 108–14 64th Road. Forest Hills, New York*

■ The Government next seeks forfeiture of the real property and premises known as 108–14 64th Road, Forest Hills, New York. This property was purchased by Arkadiy in 2012, and recorded in the name of M & A Star Realty, LLC. Dkt. 683–1. The purchase was made by a series of official checks from TD Bank in Arkadiy's name. *Id.* Arkadiy later assigned all his rights and interest in the sales contract to M & A Star Realty, LLC. *Id.* The evidence shows that at least the bottom part of this property was used by members of the conspiracy to meet and store counterfeit currency. Loz said he had been at the premises on multiple occasions to deliver counterfeit currency to the Bangiyevs. Specifically, Loz delivered a large amount of counterfeit currency to Eduard at the 64th Road property on May 28th, 2014. This exchange has been confirmed by Loz and Eduard, and by USSS agents who saw Loz park his rental car in the alley behind the residence that night. They also saw Eduard park a block away, walk toward Loz's rental car, and drive away 43 minutes later. According to Loz, Arkadiy directed him to meet Eduard at the 64th Road property for this exchange. These facts establish by a preponderance of the evidence that the 64th Road property was used as an instrumentality to carry out the RICO conspiracy. Accordingly, it is subject to forfeiture under 18 U.S.C. § 1963(a)(2).

Alternatively, and explained fully in Part IV.C., the purchase price of the property was almost certainly derived from proceeds Arkadiy obtained, directly or indirectly, from racketeering activity. Accordingly, the property is also subject to forfeiture under 18 U.S.C. § 1963(a)(3) as proceeds of the RICO conspiracy. Final-

---

1. Arkadiy has not submitted his own brief in opposition to the Government's Motion for Preliminary Order of Forfeiture. Rather, Arkadiy has merely adopted Eduard's arguments against the forfeiture by reference to Eduard's opposition brief in his Memorandum on Sentencing. Dkt. 690, at 19.

ly, it is also subject to as forfeiture under 18 U.S.C. § 1963(m) as a substitute asset.

As noted above, the forfeiture of interests outside of the criminal enterprise, including "property that affords a source of influence over an enterprise," is subject to a rule of proportionality. *See, e.g. United States v. Angiulo*, 897 F.2d 1169, 1211 (1st Cir.1990), *United States v. McKeithen*, 822 F.2d 310, 315 (2d Cir.1987) (concluding that defendant need only forfeit 43% of property because the jury found that only "43% of defendant's interest in the [real] property afforded him a source of influence over the" criminal enterprise). Under this rule, interests outside the enterprise "are only subject to forfeiture to the extent they are tainted by the racketeering activity." 897 F.2d at 1212. The Governments admits that the top part of the property was rented out while the bottom part was used by members of the conspiracy to meet and store counterfeit currency. This would suggest that only the bottom portion of the property should be subject to forfeiture. However, the remainder of the property is also subject to forfeiture as it was almost certainly purchased with proceeds of the conspiracy.

*b. $7,178.74 Held in the Account Ending in 24400 at TD Bank in the Name of M & A Star Realty, LLC*

The Government next seeks forfeiture of $7,178.74 held in a bank account by M & A Star Realty, LLC. The mailing address for the account is Eduard's residence, 110–73 69th Ave, Forest Hills, New York, a former residence of Arkadiy. The Government argues that the bank account afforded Arkadiy a source of influence over the conspiracy because M & A Star Realty, LLC, is a shell company the Bangiyevs used to hide their counterfeiting activities. However, the Government has not explained how exactly the account was utilized as an instrumentality or how it gave Arkadiy additional influence over the conspiracy.

Accordingly, the account is not subject to forfeiture under 18 U.S.C. § 1963(a)(2). However, the Court finds the money in the account is subject to forfeiture under 18 U.S.C. § 1963(a)(3) as proceeds of the RICO conspiracy, as explained fully in Part IV.C., and under 18 U.S.C. § 1963(m) as substitute assets.

*3. The Premises Known at 110–37 69th Avenue, Forest Hills, New York*

The Government next seeks forfeiture of the real property and premises known as 110–37 69th Avenue, Forest Hills, New York. This property was purchased in 2003 and is recorded in the names of Eduard, Irina Alishayeva, Arkadiy, and liana Bangiyeva. Although the government describes the 69th Ave. property as Arkadiy's former residence, Arkadiy still has an interest in the property as his name is on the title. The property is subject to forfeiture under 18 U.S.C. § 1963(a)(2) as property affording a source of influence over the enterprise because it was used to further the conspiracy. Law enforcement seized several commercial grade money counters from this residence in May 2014 that were used to count both real and counterfeit money throughout the course of the conspiracy. Loz also stated that he met the Bangiyevs at the 69th Street property to obtain payment from Eduard in April of 2014. This is confirmed by USSS agents who observed Arkadiy and Loz drive to the 69th Ave. residence on April 23, 2014. The agents later saw Arkadiy, Eduard, and Loz leave the residence together. Finally, Arkadiy used the 69th Ave. property as the mailing address for M & A Star Realty, LLC, the shell company he used to buy the 64th Road property where counterfeit currency was stored.

Arkadiy argues that the property is not subject to forfeiture as property affording

a source of influence over the enterprise because the only evidence linking the property to the enterprise are three invoices indicating that Loz used this address when purchasing an etching machine and printing supplies. Arkadiy argues he was not aware that Loz was using the address for these purchases. This argument ignores the other evidence, outlined above, showing the residence afforded Arkadiy a source of influence over the enterprise. In the alternative, the property is subject to forfeiture as a substitute asset under 18 U.S.C. § 1963(m). However, the property is not subject to forfeiture under 18 U.S.C. § 1963(a)(3) as proceeds of the RICO enterprise because the property was purchased in 2003, before the RICO conspiracy began.[2]

### C. Assets Subject to Forfeiture Primarily as Proceeds of the RICO Conspiracy

 The Government next seeks the forfeiture of the following assets primarily as proceeds of the RICO Conspiracy under 18 U.S.C. § 1963(a)(3) or, alternatively, as substitute assets under 18 U.S.C. § 1963(m):

1. Approximately $572,848.39 in an account with a number ending in 8926, at TD Bank, held in the name of Arkadiy Bangiyev and liana Bangiyev;

2. The real property and premises known as 102–02 65th Road, Rego Park, New York, recorded in the names of Arkadiy Bangiyev, liana Bangiyeva, and Irina Alishayeva;

3. Approximately $8,718.30 in U.S. currency seized at the 65th Road property;

4. Approximately $23,785 worth of Jewelry seized at the 65th Road property;

5. Approximately $1,043.38 in an account ending in 9268, at TD Bank, held in the names of Arkadiy and Anna Bangiyev;

6. Approximately $7371.71 in an account ending in 8949, at TD Bank, held in the names of Arkadiy and liana Bangiyev;

7. The real property and premises known at 112–44 68th Ave. Forest Hills, New York, recorded in the names of Arkadiy and Anna Bangiyev;

8. The shares of stock and the proprietary lease related to the residential cooperative apartment known as 61–25 98th Street, #10N, Rego Park, New York, and recorded in the name of Arkadiy;

9. The real property and premises known as 98–21 67th Ave. and 98–23 67th Ave., both in Rego Park, New York;

10. One 2008 Lexus LX570, VIN:JTJHY00W284010109 registered in the name of liana Bangiyeva.

As explained below, all of these assets are subject to forfeiture by Arkadiy as proceeds of the conspiracy or substitute assets.

There is a large discrepancy between the income Arkadiy has reported on his taxes and the amount of money he has spent on real estate and personal property between 2004 and 2014. From 2008 until 2011, Arkadiy reported that his adjustable gross income totaled approximately $286,000. Arkadiy's first and second wives

---

2. This real property may be subject to only partial forfeiture that recognizes the interests that innocent third parties have in the property. *See Pacheco v. Serendensky*, 393 F.3d 348, 354–55 (2d Cir.2004). However, the Federal Rules of Criminal Procedure require this Court to enter an order "without regard to any third party's interest in the property." Fed.R.Crim.Pro. 32.2(b)(2)(A) "Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)." *Id.*

reported no income on their jointly filed federal tax returns. At the same time, Arkadiy amassed hundreds of thousands of dollars in different bank accounts and acquired multiple pieces of real property. This large discrepancy between Arkadiy's reported income and the amounts of money he accumulated and spent indicates that he was making significant amounts of money from another source. With no alternative explanation, and ample evidence supporting Arkadiy's involvement in a large counterfeiting enterprise, the Court must conclude that Arkadiy obtained the money through the RICO conspiracy. Accordingly, Arkadiy's unexplained wealth, in its many forms, is subject to forfeiture as proceeds of the conspiracy or as substitute assets. Therefore, Eduard's unexplained wealth including cash seized from the 65th Road property and money held in the TD bank accounts are all subject to forfeiture. This also includes the $7,178.74 held in account no. 427–0124400 at TD Bank held in the name of M & A Star Realty, LLC.

For the same reasons set forth above, Arkadiy's many pieces of real property are subject to forfeiture as proceeds of the conspiracy or as substitute assets. The 65th Road property was purchased in September 2008 for $880,000 and, accordingly to his tax returns, was owned by Arkadiy between 2008 and 2010. In June 2009, the United States moved to forfeit the residence on the grounds that the property was purchased with money obtained from a bank fraud. In November of 2011, the government agreed to dismiss the forfeiture action in exchange for a payment of $662,500. This property was originally purchased and the settlement with the government was reached after the conspiracy began. There is no evidence of alternative sources of wealth with which the title holders could have afforded the property, the Court concludes it was likely obtained with proceeds from the conspiracy.

Next, the 68th Ave. property was purchased in 2011 for $1,150,000 and Arkadiy's name is on the title. Similarly, the stock and lease related to the cooperative apartment on 98th Street were purchased in 2011 for $105,000 and the deed was recorded in Arkadiy's name. Both of these were purchased during the conspiracy and there is no evidence that Arkadiy could have afforded them independent of the conspiracy. Thus they are both subject to forfeiture as proceeds of the conspiracy or as substitute assets.

The properties on 67th Street are not quite as clear. The properties were originally purchased in November 2007 by Eduard's wife, Irina Alishayeva, and Arkadiy's first wife, Julia Udovenko. On June 12, 2009, the ownership for 98–21 was transferred to Arkadiy and Irina Alishayeva, and the ownership for 98–23 was transferred to Arkadiy. Then on July 23, 2009, ownership of both 98–21 and 98–23 was transferred to liana Bangiyev, Arkadiy's sister, and Irina Alishayeva. However, according to his tax returns, between 2008 and 2010, Arkadiy owned both pieces of property. The Court agrees that based on their reported income, Eduard's wife, Irina Alishayeva, and Arkadiy's first wife, Julia Udovenko, would not have been able to afford the 67th Street properties. Moreover, the mortgages for the properties were paid out of an account held jointly by Arkadiy and liana. Again, without any alternative source of wealth, the Court finds by a preponderance of the evidence that Arkadiy purchased the properties with proceeds of the conspiracy.

Finally, the government seeks the forfeiture of two categories of personal property. First, the Government seeks the forfeiture of $23,785 worth of jewelry seized at the 65th Road property. As explained above, Arkadiy has an ownership interest in this piece of real property, along with

liana Bangiyeva and Irina Alishayeva. It is unclear exactly who owns this jewelry. However, based on Irina Alishayeva's tax records, it is clear she could not have afforded to purchase this jewelry. Arkadiy has also not denied an ownership interest in the jewelry or provided an alternative explanation for how it was obtained. Accordingly, the Court finds it is subject to forfeiture as proceeds of the RICO conspiracy, or alternatively, as substitute assets.

Second, the Government seeks the forfeiture of a 2008 Lexus registered in the name of liana Bangiyeva, Arkadiy's sister. In support of its argument the Government points out that the registered address for the car is the address of Westbury Jewelry, the former business of Eduard and Arkadiy. In addition, during an interview with the Probation Office, Arkadiy stated he had an ownership interest in the vehicle. Arkadiy does not deny this claim now. These facts are enough to establish by a preponderance of the evidence that Arkadiy has an interest in the car and likely purchased it using proceeds from the conspiracy. Accordingly, the Lexus is subject to forfeiture under 18 U.S.C. § 1963(a)(3).

## V. Conclusion

It is ORDERED:

1. Pursuant to 18 U.S.C. §§ 1963(a)(3) and Fed.R.Crim.P. 32.2(b)(1)(A), the defendant shall forfeit $20,000,000 to the United States, representing proceeds obtained, directly or indirectly, from the racketeering activity that is the subject of his conviction, and, accordingly, a money judgment in that amount is hereby entered against him in favor of the United States of America.

2. Pursuant to 18 U.S.C. §§ 1963(a)(2), the following properties are forfeited to the United States of America as any (a) interest in; (b) security of; (c) claim against; or (d) property or contractual right of any kind affording a source of influence over the racketeering enterprise which the defendant established, operated, controlled, conducted or in which he participated, in violation of 18 U.S.C. § 1962:

a. Approximately $71,494 in U.S. currency seized on May 28, 2014, from the business premises of A.K. 47th Street Buyers, at 74 West 47th Street in New York, N.Y.;

b. Approximately $77,707 worth of jewelry, coins and gemstones seized on May 28, 2014, from the business premises of A.K. 47th Street Buyers at 74 West 47th Street, New York, N.Y.;

c. Approximately $4,824 in the account end in 6249 at PNC Bank, and held in the name of A.K. 47th Street Buyers;

d. The Real Property Known as 108–14 64th Road, Forest Hills, New York;

e. The Real Property and Premises Known as 110–37 69th Avenue, Forest Hills, N.Y.;

3. Pursuant to 18 U.S.C. §§ 1963(a)(3) and (m), and the provisions of the defendant's plea agreement, the following properties are forfeited to the United States of America as assets constituting or derived from any proceeds the defendant obtained, directly or directly, from counterfeiting or racketeering, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the proceeds of his offense:

a. Approximately $572,848.39 in an account with a number ending in 8926, at TD Bank, held in the name of Arkadiy Bangiyev and liana Bangiyev;

b. The real property and premises known as 102–02 65th Road, Rego Park, New York, recorded in the

names of Arkadiy Bangiyev, liana Bangiyeva, and Irina Alishayeva;

c. Approximately $8,718.30 in U.S. currency seized at the 65th Road property;

d. Approximately $23,785 worth of Jewelry seized at the 65th Road property;

e. Approximately $1,043.38 in an account ending in 9268, at TD Bank, held in the names of Arkadiy and Anna Bangiyev;

f. Approximately $7371.71 in an account ending in 8949, at TD Bank, held in the names of Arkadiy and liana Bangiyev;

g. The real property and premises known at 112–44 68th Ave. Forest Hills, New York, recorded in the names of Arkadiy and Anna Bangiyev;

h. The shares of stock and the proprietary lease related to the residential cooperative apartment known as 61–25 98th Street, #10N, Rego Park, New York, and recorded in the name of Arkadiy;

i. The real property and premises known as 98–21 67th Ave. and 98–23 67th Ave., both in Rego Park, New York;

j. One 2008 Lexus LX570, VIN:JTJHY00W284010109 registered in the name of liana Bangiyeva;

k. Approximately $7,178.74 held in the account ending in 24400 at TD Bank in the name of M & A Star Realty.

4. The defendant's liability for the money judgment described in Paragraph 1 of this Order shall be reduced by the net amount of money that is realized by the United States upon the final forfeiture of the assets described in Paragraph 3, above, free from the claims of any other party.

5. The defendant's liability for the money judgment described in Paragraph 3 of this Order shall be joint and several with that of Itzhak Loz; Ronen Fakiro; Eduard Bangiyev; Boaz Borohov; Ofra Borohov; and Johnny Lee.

6. The Attorney General, or a designee, is hereby authorized to seize, inventory, and otherwise maintain custody and control of the property, whether held by the defendant or by a third party, and to conduct any discovery proper in identifying, locating or disposing of the property subject to forfeiture pursuant to Fed. R.Crim.P. 32.2(b)(3) and 18 U.S.C. §§ 1963(g)(4) & (5).

7. The United States shall publish notice of this order and of its intent to dispose of the property in such manner as the Attorney General may direct, including publication on the Government's Internet site, www.forfeiture.gov, for 30 consecutive days, and to the extent practicable, provide direct written notice to any persons known to have alleged an interest in the property, pursuant to Fed.R.Crim.P. 32.2(b)(6) and 18 U.S.C. § 1963(*l*)(1).

8. This Preliminary Order of Forfeiture is final as to the defendant, and shall be made part of the defendant's sentence and included in the Judgment in this case pursuant to Fed.R.Crim.P. 32.2(b)(3) and 18 U.S.C. § 1963(a).

9. Any person, other than the defendant, asserting any legal interest in the property may, within 30 days of the final publication of notice or his receipt of notice, whichever is earlier, petition the court for a hearing to adjudicate the validity of the alleged interest in the properly pursuant to Fed.R.Crim.P. 32.2(c)(1) and 18 U.S.C. § 1963(1)(2).

10. If no third party files a timely petition or if this Court denies and/or dismisses all third party petitions timely filed, this

Preliminary Order of Forfeiture shall become the Final Order of Forfeiture, and the United States shall have clear title to the property and may warrant good title to any subsequent purchaser or transferee pursuant to Fed.R.Crim.P. 32.2(c)(2) and 18 U.S.C. § 1963(1)(7).

11. If this Court grants any third party rights, a Final Order of Forfeiture that amends this Order of Forfeiture as necessary to account for said third party rights, shall be entered pursuant to Fed. R.Crim.P. 32.2(c)(2) and 18 U.S.C. § 1963(1)(6).